UNITED STATES of America, Plaintiff–Appellee,

v.

**Billy L. TALLEY, Defendant–Appellant.**

No. 97–5640.

United States Court of Appeals, Sixth Circuit.

Argued July 28, 1998.

Decided Jan. 14, 1999.

Frederick H. Godwin, Asst. U.S. Attorney (argued and briefed), Office of the U.S. Attorney, Memphis, TN, for Plaintiff–Appellee.

Arthur E. Quinn (argued and briefed), Memphis, TN, for Defendant–Appellant.

Before: JONES, RYAN, and MOORE, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Defendant–Appellant Billy Talley ("Talley") appeals his conviction and sentence for two counts of solicitation to commit the murder of an FBI agent and witness informant. Talley asserts seven errors on appeal. For the reasons stated herein, we find that the district court did not err on any of these grounds, and affirm Talley's conviction and sentence.

## I.

In late 1995, the Federal Bureau of Investigation ("FBI") began investigating an individual by the name of Kelvin Marr. Marr

subsequently became a government informant and began providing information regarding criminal activity allegedly committed by Talley, who at that time was a lieutenant and deputy sheriff in the Shelby County Sheriff's Department in Memphis, Tennessee. In order to substantiate this information, Ellis E. Young, the primary investigator on the case and a Special Agent with the FBI, asked Marr to tape record conversations between Marr and Talley regarding various criminal activities. Marr complied with Young's request, and on several occasions, Marr recorded conversations he had with Talley and delivered them to Young. As a result of Young's investigation, Talley was subsequently arrested and charged with various criminal activities.[1] Other than Young and Marr, there were no witnesses who could testify about the tapes Marr made of his conversations with Talley.

On January 27, 1996, shortly after his arrest, Talley contacted his friend, Ron Tyler. Tyler and Talley met and became close friends while Tyler was an inmate and Talley was a jailer at the Shelby County Jail. In fact, Talley had saved Tyler's life on one occasion and Tyler considered Talley to be his best friend. At one point, Tyler had even worked as an informant for Talley. Although this conversation was not recorded, Tyler testified at trial that Talley specifically asked him to "take 'um out and pop 'um," which Tyler understood to be a request for him to kill Young and Marr. According to Tyler, Talley explained that he wanted Young and Marr killed because he did not want to lose his job or go to jail based on the criminal charges against him. Tyler then immediately contacted his lawyer, who contacted the United States Attorney's office. The office assigned Special Agent John Seaberg of the FBI to interview Tyler and conduct an undercover investigation of Talley.

On January 30, 1996, Seaberg arranged for Tyler to tape record a conversation with Talley. Seaberg instructed Tyler to give Talley's friend and attorney at the time, Mark Saripkin, the number of a telephone booth in Little Rock, Arkansas, and an assigned time for Talley to call Tyler.[2] The conversation between Talley and Tyler proceeded as follows:

Tyler: All right. So I know what me and you's [sic] already talked about.

Talley: Right.

Tyler: And I know then . . .

Talley: (Unintelligible), yeah.

Tyler: Listen, listen . . .

Talley: Call it the thing.

Tyler: Huh?

Talley: Call it the thing.

Tyler: Call what?

Talley: What me and you talked about.

Tyler: What the pop?

Talley: Yeah.

Tyler: All right. We'll call it the thing then. All right. Listen, uh BILLY, don't you trust me?

Talley: Absolutely, a hundred percent.

Tyler: Then why [expletive] are we calling a lick, a [expletive] hit, a thing?

Talley: Yeah, well.

J.A. at 140–41. Tyler then informed Talley that he had spoken with Saripkin, about getting "stuff" on Marr and Young. J.A. at 147–48. Tyler stated that Saripkin had informed him that he had already obtained a picture of Marr, and that he would find out where Young lived. Tyler had previously indicated to Saripkin that he needed this information because he wanted to come into town and do the "thing" and then get out. Additionally, Tyler told Talley that in return for his help, he wanted Talley to do a "drive-by" shooting of individuals he held responsible for murdering his mother and shooting three of his children. Talley agreed to do the drive-by as soon as he got "this off [his] back."

On February 20, 1996, a federal grand jury returned a two count indictment against Talley. Count One concerned the January 27, 1996 unrecorded conversation between Tyler

---

1. Talley was charged with disposing a firearm to a convicted felon, altering the identification number of an automobile, and possession with intent to distribute Dilaudid and morphine tablets.

2. Seaberg also arranged for Tyler to conduct tape recorded conversations with Mark Saripkin, but these were not admitted into evidence.

and Talley, and charged that Talley "solicited, induced and endeavored to persuade another person to kill, and attempt to kill" a Special Agent employed by the FBI, in violation of 18 U.S.C. § 1114, and a witness with intent to prevent that witness from testifying, in violation of 18 U.S.C. § 1512, all in violation of 18 U.S.C. § 373. Count Two concerned the January 30, 1996 tape-recorded telephone conversation between Tyler and Talley and charged Talley with the criminal violations specified in Count One.

The jury trial in Talley's case commenced on December 4, 1996. The key evidence presented by the government was Tyler's testimony and the tape-recorded conversation between Talley and Tyler. During the trial, the government provided each juror with an individual headset and a tape of Talley's January 30, 1996 telephone conversation with Tyler. The taped conversation was also played simultaneously in open court, and the government provided jurors with a written transcript of the tape recorded conversation to read while listening to the tapes. At some point, two jurors removed their headphones for a few minutes, complaining that there was static on the tapes and that portions of the tapes were playing too loudly. Both jurors indicated that although they had removed their headphones, they had continued to read the transcripts. At this juncture, Talley's attorney reasserted a previous objection to the headphones, arguing that the sound system was inappropriate because each juror could have heard the tapes differently. The district court overruled the objection, noting that the jurors all had copies of the transcript, and that to the extent that there were differences in the quality of sound on the tapes, all the jurors had the same information because of the printed transcript.

At trial, the government called Tyler as a witness, at which time he attempted to invoke his Fifth Amendment privilege against self incrimination. The district court, however, rejected this attempt and ordered Tyler to testify, noting that the government had granted him immunity pursuant to 18 U.S.C. §§ 6002 and 6003. During Tyler's cross-examination, the defense elicited that Tyler's real name was Ronnie Atkins, and that he had changed his name after enrolling in a federal witness protection program. Appar-

ently, while serving time in jail on an unrelated charge, Tyler was informed that he was no longer eligible for the program. From the beginning of his involvement in the FBI's investigation of Talley, Tyler had requested to be reinstated in the program. Although the government refused to reinstate Tyler in the witness protection program, the FBI did provide him with money to relocate his family.

Also during the trial, Talley attempted to call Saripkin in order to refute portions of Tyler's testimony. Unlike Tyler, however, Saripkin had not been granted immunity, and on advice of counsel, Saripkin refused to testify. Talley then submitted an offer of proof as to Saripkin's testimony, which provided that Saripkin would have testified as follows: that he represented Talley; that during his representation he received contacts from Tyler, each of which Tyler had initiated except one; that he did not plan, scheme or conspire with Tyler or Talley to eliminate witnesses; and that during his conversations with Tyler, Tyler was extremely aggressive and domineering.

The jury found Talley guilty on both counts of the indictment, and on April 21, 1997, the district court sentenced Talley to 170 months' imprisonment on each count, to run concurrently. Talley was also ordered to serve a period of three years' supervised release and to pay a special assessment of $50. This timely appeal followed.

## II.

Talley raises the following seven issues on appeal: 1) insufficiency of the evidence; 2) failure to grant a witness immunity; 3) hearsay and bad act evidence improperly admitted through evidence of a tape recorded conversation; 4) improper use of headphones by jurors; 5) improper empaneling of an anonymous jury; 6) denial of his motions for a mistrial; and 7) improper enhancement of his sentence pursuant to U.S.S.G. § 3A1.2(a). We analyze each of these arguments in turn.

### A. Insufficiency of the Evidence

Talley first contends that the evidence the government presented at trial was

insufficient to sustain his convictions, and thus, the district court erred in denying his motion for judgment of acquittal. In deciding whether the evidence is sufficient to withstand a motion for an acquittal, and support a conviction, the court views all evidence in the light most favorable to the prosecution and determines whether there is any evidence from which a reasonable jury could find guilt beyond a reasonable doubt. *See United States v. Welch,* 97 F.3d 142, 148 (6th Cir.1996), *cert. denied sub nom. Parker v. United States,* — U.S. —, 117 S.Ct. 999, 136 L.Ed.2d 879 (1997). In undertaking this analysis, this court neither independently weighs the evidence, nor judges the credibility of witnesses who testified at trial. *Id.* A court properly denies a challenge to the sufficiency of the evidence where "after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Allen,* 954 F.2d 1160, 1169 (6th Cir.1992).

To establish his insufficiency of the evidence claim, Talley must show that the government failed to prove beyond a reasonable doubt that he committed the elements of the crimes for which he was charged, namely that he possessed the intent to solicit, induce, or persuade Tyler to murder Young or Marr. In an attempt to meet this heavy burden, Talley merely complains that Tyler's testimony and the tape of the January 30, 1996 conversation clearly demonstrate that it was Tyler, not Talley, who was the aggressor. From this premise, Talley argues that Tyler's oral testimony was incredible and virtually meaningless.

■ The federal crime of solicitation to commit a crime of violence punishes

> [w]hoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces or otherwise endeavors to persuade such person to engage in such conduct[.]

18 U.S.C. § 373(c)(Supp.1998). Although this court has not addressed the issue, other circuits have articulated guidelines to be used in solicitation cases. As for the intent element of the crime, the Third Circuit has noted that in order to establish that the defendant engaged in conduct in violation of § 373, "the government must prove by 'strongly corroborative circumstances' that the defendant had the intent that another person engage in conduct constituting a crime described in Title 18 . . . and that the defendant actually commanded, induced or otherwise endeavored to persuade the other person to commit the felony." *United States v. McNeill,* 887 F.2d 448, 450 (3d Cir.1989). One factor strongly corroborative of intent, is "the fact that the defendant offered or promised payment or some other benefit to the person solicited if he would commit the offense." *United States v. Gabriel,* 810 F.2d 627, 635 (7th Cir.1987) (quoting S.Rep. No. 309, 97th Cong., 1st Sess. 183 (1982)). As for the other elements of the crime of solicitation, murder clearly constitutes "physical force" as contemplated by the § 373, and the tapes indicate at a minimum that Talley "endeavor[ed] to persuade" Tyler to murder Young and Marr.

■ In most respects, Talley's argument here is merely a challenge to Tyler's credibility, packaged as an insufficiency of the evidence claim. Here, the tape of the January 30, 1996 conversation clearly shows that Talley promised to do a "drive-by" shooting after Tyler completed his end of the bargain—namely killing Marr and Young. Additionally, Tyler testified that Talley approached him initially, requesting that he kill Young and Marr. The January 30, 1996, taped conversation confirmed their previous discussions and finalized the agreement. Although Tyler may not be the most credible witness, it is well-settled that on appeal, there "is no place . . . for arguments regarding a government witness's lack of credibility . . . ." *United States v. Adamo,* 742 F.2d 927, 934–35 (6th Cir.1984). Indeed, "[i]t is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story." *United*

*States v. Gallo,* 763 F.2d 1504, 1518 (6th Cir.1985) (quoting *United States v. Bailey,* 444 U.S. 394, 414–15, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980)). We note also that Tally's trial counsel took full advantage of his opportunity to attack Tyler's credibility on cross-examination and during his closing argument. We find that the jury was clearly able to assess Tyler's credibility at trial, and we cannot say that based on the evidence presented, the jury was irrational in finding that Talley committed all elements of the crimes for which he was charged. Thus, Tyler's testimony, coupled with the tape of the January 30, 1996 conversation, provided sufficient evidence to sustain Talley's convictions.

## B. Failure to Grant Immunity to Saripkin

Talley next contends that the district court erred by failing to either immunize Saripkin or compel the government to do so. Talley claims that it was unfair that Tyler was required to testify pursuant to a grant of immunity, but that Saripkin was not.[3] Talley asserts that this case represents a situation in which the government has "lopsided" access to evidence by using its powers to grant immunity to Tyler, without allowing Talley to call Saripkin to refute these statements. We disagree.

We have consistently held that a district court is without authority to either grant immunity to a witness who asserts his Fifth Amendment privilege against self incrimination, or to force the government to do so. *See, e.g., United States v. Medina,* 992 F.2d 573, 585–86 (6th Cir.1993); *United States v. Mohney,* 949 F.2d 1397, 1401 (6th Cir.1991); *United States v. Pennell,* 737 F.2d 521, 526–27 (6th Cir.1984). We have, however, discussed, but not explicitly accepted, two limited situations in which such immunity may be warranted: where immunity is necessary to enable a defendant to present an effective defense and/or to remedy prosecutorial mis-

conduct. Neither of these situations is at issue here.

As an initial matter, we note that this court has previously discussed and rejected the so-called "effective defense" theory. *See Mohney,* 949 F.2d at 1401 (holding that "federal courts do not have the inherent power to immunize witnesses whose testimony is essential to an effective defense"). *But see Government of Virgin Islands v. Smith,* 615 F.2d 964, 972 (3d Cir.1980)(noting that such immunity is available when the defendant properly seeks it, the witness is available to testify, the testimony is essential and exculpatory, and governmental interests are not strongly outweighed). We have explicitly noted that compelled judicial use immunity would raise separation of powers concerns, because the decision of whom to prosecute is soundly within the discretion of the prosecutor, not the courts. *Mohney,* 949 F.2d at 1401. Moreover, adopting such a theory would force courts to place the government in the undesirable position of choosing whether to prosecute the defendant or the witness. *Id.* ("[c]ompelled judicial use immunity could also impair the subsequent prosecution of the witness"). We recognize that in certain limited situations, the government's selective grant of immunity to its own witnesses, while denying immunity to the defendant's witnesses, may deprive the defense of a fair trial, and in some cases require a judicially compelled immunity grant. *Id.* at 1402 (noting that "[s]elective grants of immunity could violate due process where they produce egregiously lopsided access to evidence."). Nonetheless, we have been cautious to note that "[a] defendant . . . does not have a right to have his witnesses immunized simply because the prosecution relies on immunized witnesses to make its case." *Id.* Instead, "[i]f the government's prosecutorial interest in [prosecuting accused felons] outweighs a defendant's interest in presenting such evidence . . . then the government's interest also outweighs any abstract concern

---

**3.** The federal immunity statute, 18 U.S.C. §§ 6001–6005, provides that an "agency of the United States" may move to compel testimony pursuant to these provisions, and "the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled

under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." 18 U.S.C. § 6002 (Supp.1998).

with symmetry." *Id.* (citations and quotation marks omitted). In this case, Talley makes no allegations which demonstrate that the evidence was so "egregiously lopsided" by the grant of immunity to Tyler and not Saripkin that an unfair trial resulted. While Saripkin may have supported Talley's argument that Tyler was the aggressor, the key piece of evidence in this case came from the tape recorded conversation between Tally and Tyler. Consequently, we find that Talley presents no compelling reasons here for us to revisit our previous holdings on the effective defense theory.

■ Talley garners no support from the second theory, that immunity may be warranted in order to remedy prosecutorial misconduct. *See id.,* 954 F.2d 1160 This court has discussed, but not yet decided, whether to adopt a rule allowing the district court to grant immunity in limited circumstances in order to remedy prosecutorial misconduct. *See id.; Medina,* 992 F.2d 573; *Pennell,* 737 F.2d at 527. "Under this theory, due process requires an immunity grant where the prosecution abuses its discretion by intentionally attempting to distort the fact-finding process." *Mohney,* 949 F.2d at 1402. To this end, the defendant must establish that "the government's decisions were made with the deliberate intention of distorting the judicial fact finding process." *Id.* (citations and quotation marks omitted). Talley has failed to do so. In making his argument, Talley overlooks the fact that at no point did the government attempt to prevent Saripkin from testifying. *See Medina,* 992 F.2d at 586 (noting that circuits recognizing the theory have done so where the government took "affirmative actions" to prevent testimony of defense witnesses) (citing *United States v. Westerdahl,* 945 F.2d 1083, 1086 (9th Cir.1991)). Moreover, the government has indicated that Saripkin was the subject of a criminal investigation, and that it did not grant immunity to him because it was deciding whether to pursue criminal charges against him concerning his involvement in the case. During the trial, Saripkin asserted the Fifth Amendment on advice from his attorney, not because of any pressure from the government. Finally, it seems reasonable that Tyler was given immunity, and Saripkin was not, where Tyler

initially contacted the government to report Talley's activities and served as a government informant throughout the case. Thus, even assuming that the prosecutorial misconduct theory is cognizable in the Sixth Circuit, we are confident that Talley has made no showing of such misconduct in this case.

## C. Motion in Limine

Talley next challenges the district court's denial of his motion in limine, which sought to exclude portions of the January 30, 1996 conversation pursuant to Federal Rules of Evidence 402, 403, 404, and 802. Although Talley's motion failed to specify on which evidentiary rule he was relying to establish inadmissibility of each statement, the district court determined that all statements challenged by Talley were admissible, and therefore denied Talley's motion.

■ Talley argues that the following statements, allegedly made by Saripkin, were inadmissible hearsay statements: 1) that Saripkin told Tyler that Talley did not want to meet with or see him, and that Tyler "had to bring everything to [Saripkin's] office;" 2) that if "Marr and Young don't show up down there, [Saripkin] can squash all them [sic] tapes and stuff;" 3) that Talley was facing thirty years, but Saripkin could have the sentence reduced to sixteen or eighteen months; and 4) that if Tyler hired Saripkin as an attorney the conversations would be protected. The district court rejected Talley's arguments, and concluded that all of the statements contested by Talley were admissible as coconspirators' statements under Fed. R.Evid. 801(d)(2)(E). Although we review the district court's admission of testimony or other evidence at trial for an abuse of discretion, we review de novo the district court's conclusion as to whether proffered testimony is hearsay. *See United States v. Latouf,* 132 F.3d 320, 329 (6th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 1572, 140 L.Ed.2d 805 (1998); *United States v. Fountain,* 2 F.3d 656, 668 (6th Cir.1993).

■ We agree that the statements were admissible, and thus, the district court did not err in refusing to redact these statements. Although the district court took a slightly different approach,[4] we conclude that

---

4. The district court concluded that the state-

ments were coconspirator statements admissible

because the government did not offer the statements for their truth, the statements fall outside of the definition of hearsay. *See* Fed.R.Evid. 801(c)("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Having found that the statements fall outside of the technical definition of hearsay, we need not determine whether a conspiracy existed between the parties to justify their admission as statements of a coconspirator.

 Talley's second ground for excluding the statements is equally unavailing. He argues that certain other statements were inadmissible because they permitted the introduction of "other crimes, wrongs, or acts," in contravention of Federal Rule of Evidence 404(b). The contested statements indicated, among other things, that Talley was involved with removing identification numbers from stolen cars, that Tyler and Talley sold drugs together, that Tyler had other information about illegal activity in which Talley was involved, and that Talley became involved with Marr for five thousand dilaudid tablets. Rule 404(b) provides that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident ... [5]

The trial court has broad discretion in determining whether to admit or exclude evidence under Rule 404(b). *See United States v. Vance,* 871 F.2d 572, 576 (6th Cir.1989);

*United States v. Ebens,* 800 F.2d 1422, 1433 (6th Cir.1986). In making this determination, the court must first decide whether "one of the factors justifying the admission of 'other acts' evidence is material, that is, 'in issue' in the case, and if so whether the 'other acts' evidence is probative of such factors." *United States v. Johnson,* 27 F.3d 1186, 1190 (6th Cir.1994). The court must then determine whether the probative value of the evidence is outweighed by its potential prejudicial effect. Fed.R.Evid. 403; *Johnson,* 27 F.3d at 1190–91; *United States v. Acosta–Cazares,* 878 F.2d 945, 948–49 (6th Cir.1989).

The government argues that these statements were properly admitted because they established Talley's motive, plan, or intent. We find the government's argument to be well-taken. We have previously held that evidence of underlying crimes is admissible to prove motive, and here, the "other acts" evidence included in the recordings established Talley's motive to commit murder. *See Vance,* 871 F.2d at 576–77 (evidence of prior bad acts admissible to show defendant's motive for being involved in murder of state prosecutor); *see also United States v. Cummins,* 969 F.2d 223, 226–27 (6th Cir.1992) (holding that other acts evidence was probative of the defendant's motive for attempting to induce the witness to lie, and supported the contention that the defendant suborned perjury to protect himself from being implicated in his associate's criminal activities).

Several statements made by Tyler concerning "other acts" pertained to the underlying charges involving Marr and Young, and were thus properly admissible to illustrate

under Rule 801(d)(2)(E). Although it is true that the government did not charge Talley with conspiracy, we have noted that a conspiracy charge is unnecessary to admit statements under Rule 801(d)(2)(E). *See United States v. Swidan,* 888 F.2d 1076, 1080 (6th Cir.1989). The court is merely required to find, by a preponderance of the evidence, that a conspiracy existed, the defendant against whom the hearsay is offered was a member of that conspiracy, and the hearsay statement was made in furtherance of the conspiracy. *Id.* However, in its order for Talley's motion in limine, the district court also noted that the statements were non-hearsay because they provided meaningful context to the conversation and they were not admitted for their truth,

and we find it sufficient to affirm on those grounds. *See Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.,* 772 F.2d 214, 216 (6th Cir. 1985)("A decision below must be affirmed if correct for any reason, including a reason not considered by the lower court.").

5. Rule 404(b) also requires that the government provide "reasonable notice in advance of trial" when the prosecutor intends to use such evidence. The government notified the defendant well in advance of trial of its intent to introduce the entire tape, including those portions that might be construed as Rule 404(b) evidence. J.A. at 54.

Talley's motive for wanting them killed. As the government noted, it was required to show why a deputy sheriff, held in such high repute, would seek to have an FBI agent and witness killed. Thus, the statements demonstrated the severity of the charges against Talley and explained why he would want those witnesses eliminated.

■ In addition to motive, other statements established Talley's intent to solicit Tyler to murder Young and Marr. For example, references to the "drive-by" shooting that Tyler wished Talley to conduct in return for his help, and the reference that the FBI may have overlooked some items in executing the search warrant on Talley's house established Talley's intent to solicit and his desire to have the matter resolved as quickly as possible.

■ Finally, the district court did not err in refusing to redact other statements Tyler made in the tapes, such as that he could have put Talley in the penitentiary several times, that they had sold drugs together at one point, and that a person Tyler apparently may have had assisted in getting killed in jail was not the intended target. These statements established Talley's and Tyler's long term relationship, and helped explain why Talley, a law enforcement official, would solicit Tyler, an ex-felon, to murder two government witnesses.

■ Talley finally asserts that even if some portions of the tape were admissible as non-hearsay statements or under Rule 404(b), the district court nevertheless should have excluded them under Rule 403. At no point has Talley explained specifically which statements were unfairly prejudicial or how they were unfairly prejudicial. In any event, we find that this argument also fails. We review the district court's decision of whether to exclude evidence under Rule 403 for an abuse of discretion. In so doing, we must "look at the evidence in 'the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.'" *United States v. Bonds,* 12 F.3d 540, 567 (6th Cir.1993) (quoting *United States v. Zipkin,* 729 F.2d 384, 389 (6th Cir.1984)). A court may exclude relevant evidence under Rule 403 if its "probative value is substantially outweighed by the danger of unfair preju-

dice." Because any "other acts" evidence offered against a defendant is to some extent prejudicial, a defendant raising a Rule 403 argument must establish "unfair" prejudice, not mere prejudice. *See Robinson v. Runyon,* 149 F.3d 507, 514–15 (6th Cir.1998); *Vance,* 871 F.2d at 576–77. "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis." *Bonds,* 12 F.3d at 567 (citation and quotation marks omitted). We further note that the mere fact that Tyler's comments portrayed Talley in a negative light does not render them unfairly prejudicial. *See United States v. Kincaide,* 145 F.3d 771, 784 (6th Cir.1998). Finally, any potential prejudice was specifically addressed by the following extensive and carefully crafted limiting instruction the district court gave to the jury:

> You've heard the testimony that the defendant committed some acts other than the ones charged in the indictment. I instructed you that that testimony could be considered by you only for a limited purpose and for no other purpose.
>
> I remind you, and again instruct you, that you cannot consider the testimony as evidence that the defendant committed the crime that he is on trial for now. Instead you can only consider it in deciding whether the defendant had the motive or intent to commit the crime with which he is charged. Do not consider it for any other purpose.
>
> Remember that the defendant is on trial here only for the acts alleged in the indictment not for the other acts. Do not return a guilty verdict unless the prosecution proves the crime charged in the indictment beyond a reasonable doubt.

J.A. at 433–34. The district court also gave the jury a limiting instruction during the course of Tyler's testimony regarding the tape recorded conversation. Accordingly, we find that the district court did not abuse its discretion in admitting the statements under Federal Rules of Evidence 403, 404(b) or 801.

## D. Sound System

Talley next argues that the district court improperly allowed jurors to use individual headsets to listen to the January 30, 1996 tape recorded conversation between him and Tyler. This argument fails, because the district court clearly controls the mode of the presentation of evidence. *See* Fed. R.Evid. 611. We have previously approved of the use of tape recorded conversations and corresponding transcripts. *See United States v. Martin*, 920 F.2d 393, 396 (6th Cir.1990); *United States v. Robinson*, 707 F.2d 872, 875–79 (6th Cir.1983). Moreover, the "use of transcripts is a matter committed to the sound discretion of the trial judge and we reverse only for an abuse of discretion." *Martin*, 920 F.2d at 396. We find no abuse of discretion here. At trial, in addition to the headsets, the court used speakers to broadcast the contents of the tape to the entire courtroom, and each juror received an individual printed transcript of the tape to read while listening with the headset. Moreover, as an additional precaution, the trial judge used the headset to listen to the tape before trial, and compared the tapes to the printed transcripts in order to ensure their accuracy.[6] Consequently, there was no error in allowing the use of the individual headphones, and to the extent that any error could be found, it would be harmless given the loudspeakers and printed transcript.

## E. Anonymous Jury

Talley next argues that there were no reasons justifying an empaneling of an anonymous jury in this case, and that the district court's decision to do so interfered with his Sixth Amendment right to a fair trial. Prior to trial, the government moved for an anonymous and sequestered jury, asserting the need to protect the names, address and places of employment of all prospective jurors. The district court granted the motion, concluding that there was ample evidence that Talley had the capacity to commit violence and may have had the means and motive to interfere with the jury. Specifically, the court noted that because Talley

had allegedly tried to interfere with the judicial process by attempting to have a witness in his criminal case killed, it was not unreasonable to assume that he may try to further interfere with the judicial process. In addition, the court determined that the case was of some "modicum of interest" to the press. Accordingly, the district court granted the motion for an anonymous jury, but denied the motion for sequestration on the grounds that "sequestration would unfairly prejudice the Defendant's right to a fair trial." J.A. at 124. The decision to grant an anonymous jury is within the sound discretion of the trial court, and we review only for an abuse of discretion. *United States v. Eufrasio*, 935 F.2d 553, 573 (3d Cir.1991).

Although we have not extensively ruled on the issue of anonymous juries, other circuits have articulated guidelines to determine when circumstances of a case call for the use of an anonymous jury. For example, the Second Circuit has held that, in general, a district court should not order the empaneling of an anonymous jury without "(a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir.1991); *see also United States v. Vario*, 943 F.2d 236, 239 (2d Cir.1991). The anonymity of the jury should be preserved in cases: 1) with very dangerous persons who were participants in large scale organized crime, and who participated in mob-style killings and had previously attempted to interfere with the judicial process; 2) where defendants have had a history of attempted jury tampering and serious criminal records; or 3) where there have been allegations of dangerous and unscrupulous conduct by the defendant, coupled with extensive pretrial publicity. *See Paccione*, 949 F.2d at 1192 (and cases cited therein). In deciding to empanel an anonymous jury, the court must ensure that the defendant retains his or her right to an unbiased jury by conducting "a

---

**6.** Although the trial judge admitted that the quality of the system was not ideal, she explicitly concluded that "to the extent that there may have been ... some differences in maybe the quality of the sound, all of the jurors had the same information because they did have the benefit of the printed transcript." J.A. at 416–17.

voir dire designed to uncover bias as to issues in the cases and as to the defendant himself," and by providing the jury a neutral and non-prejudicial reason for requiring that it be anonymous, so that jurors will refrain from inferring that anonymity was necessary due to the character of the defendant.[7] *Id.* (internal citations and quotation marks omitted).

Talley correctly notes that there was no evidence that he was involved in a criminal organization that included a pattern of violence, that he had ever attempted to tamper with any previous juries (such as the grand jury in his case), or that there was any evidence of extensive pretrial publicity. In response, however, the government argues that the January 30, 1996 transcript, which was included with its motion to empanel an anonymous jury, illustrated Talley's dangerousness in this case and on other occasions, and showed that his many years of law enforcement experience provided him with the types of contacts that would enable him to tamper with the jury. The government refers to a portion of the transcript where Talley admitted that Tyler could have put him in jail many times, and that he could do likewise to Tyler, to illustrate Talley's prior manipulation of the criminal justice system. The government also emphasizes that by attempting to kill the FBI agent in his case, and a witness, Talley had already attempted to affect the judicial process. We find the government's arguments convincing. Thus, despite the absence of some of these factors in Talley's case, we cannot conclude that the district court abused its discretion by ordering the empaneling of an anonymous jury.

### F. Motion for Mistrial

 Talley next contends that the district court erred by failing to grant a mistrial. Talley moved for a mistrial on several occasions. At trial, Tyler testified that when Talley first contacted him, Talley indicated that he was "in trouble" because Marr was working for Young, and that he would probably lose his job because of the criminal charges against him. The defense moved for a mistrial after this response. Talley made his second motion for a mistrial when Tyler testified that he received money from the FBI to relocate his family for ninety days. We review the district court's denial of a motion for a mistrial for an abuse of discretion. *See United States v. Chambers,* 944 F.2d 1253, 1263 (6th Cir.1991). This court, in considering whether a mistrial is appropriate, is primarily concerned with fairness to the accused. *Id.* In addition, " 'the subsequent striking of erroneously admitted evidence accompanied by a clear and positive instruction to the jury to disregard it cures the error' unless the stricken evidence is so prejudicial that its harmful effect cannot be eliminated." *Id.* (citation omitted).

The trial judge, in overruling Talley's first motion, noted that Tyler was a difficult witness, and had to admonish Tyler on more than one occasion to answer the specific question posed. Immediately after Talley's motion, the trial judge gave clear curative instructions to the jury to disregard those statements as evidence, and there is no indication that the jury refused to or was unable to obey those instructions. Furthermore, Tyler's reference during the trial to Talley's underlying crimes was obscure and minimal. Although Talley makes the broad assertion on appeal that these statements were "unfairly prejudicial" and "intentionally elicited" by the government, he fails to explain how they were unfairly prejudicial, or offer any evidence that the government intentionally solicited improper responses from Tyler. In addition, Talley has not asserted that the government introduced Tyler's testimony in bad faith. Indeed, due to Tyler's pretrial assertion of his Fifth Amendment privilege against self-incrimination, the first occasion on which the government was able to even question Tyler was at trial. Further, to the

---

7. During voir dire, the district court explained to the jury:

> This case is one where there is likely to be a good bit ... of media interest, because it is important to all of the parties that there not be any media contact with jurors ... until this case is over, we are using your juror numbers during this process and at all times do not give

me your names, do not give the parties your names, but always when you are addressing the court refer to your juror number. We do this for your benefit to make sure ... that you are not bothered or approached by any media about this case or any aspect of it.

J.A. at 408–09.

extent that Talley reasserts his Rule 404(b) argument here, we have already addressed and rejected that argument.

 We also find that the district court correctly denied Talley's second motion for a mistrial, which he made following Tyler's testimony that the government provided him with money for relocation. On appeal, the government asserts that it had a duty to disclose any benefits that Tyler received for his testimony. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)(extending *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) to include evidence tending to impeach a government witness). Considering the fact that Tyler was the government's key witness and his credibility was at issue throughout the trial, failure to disclose a relocation benefit to the jury would have violated the rule set forth in *Giglio.* Finally, in questioning Tyler regarding the money the government provided for his relocation, the government never suggested or implied to the jury that this money was provided because Talley was dangerous or that Tyler feared that Talley would retaliate against him because of his testimony. Indeed, the full extent of this line of questioning went as follows:

> Question [AUSA]: All right. You received money from the FBI, didn't you, to relocate your family both on a short term and long-term basis?
>
> Answer [Tyler]: It was for 90 days, and Mr. Seaberg give [sic] me the money.

J.A. at 332. Immediately after the objection by Talley's counsel, the trial judge held a side-bar and prohibited the government from pursuing any further line of questioning regarding the exact amount of money the government provided Tyler for his relocation, and she subsequently gave the jury a limiting instruction regarding Tyler's comments.[8] Finally, Tyler's motivation was clearly at is-

sue, particularly in light of the fact that Talley's attorney in his opening statement noted that Tyler was motivated by his desire to be reinstated in the federal witness protection program. Talley's argument on this point is further undermined considering that on Tyler's cross-examination, his attorney extensively questioned Tyler on the witness protection program and the benefits he received from the government. Consequently, the district court did not abuse its discretion by refusing to grant a mistrial.[9]

### G. Enhancement Under U.S.S.G. § 3A1.2(a)

 Talley's final argument is that the district court erred at sentencing by enhancing his base offense level under U.S.S.G. § 3A1.2(a) on the grounds that the victim of the crime was an FBI agent. We review the district court's factual findings in relation to the application of the Sentencing Guidelines under the deferential "clearly erroneous" standard of review. *United States v. Garner,* 940 F.2d 172, 174 (6th Cir.1991). Legal conclusions regarding the Guidelines, however, are reviewed de novo. *Id.* The guidelines direct the court to increase by three levels if the victim "was a government officer or employee ... and the offense of conviction was motivated by such status." U.S.S.G. § 3A1.2(a)(1998). An offense is motivated by the victim's status where that offense "was motivated by the fact that the victim was a government officer or employee." *Id.* § 3A1.2, cmt. 4.

Talley argues that even accepting the government's theory of the case, the motivation behind the crime of solicitation was to eliminate witnesses in general, and the fact that Young, who was a potential witness in the same manner as Marr, was an FBI agent, was irrelevant. We find defendant's argu-

---

**8.** The trial judge specifically stated:

> Members of the jury, you were just listening to *testimony being provided by Mr. Tyler* regarding certain relocation activities.
>
> In that respect I'm going to instruct you that you are to disregard that testimony about relocation and anything connected to that relocation, it is not to be considered in your evaluating the guilt or innocence of Mr. Talley.
>
> I will talk with you and give you a more detail [sic] limited [sic] instruction.

> I will ask [the AUSA] to continue but disregard that testimony about relocation and why he relocated.
>
> J.A. at 337.

**9.** Talley also moved for a mistrial when Saripkin invoked his Fifth Amendment right to refuse to testify. We have disposed of that argument, *see supra* § II.C., and will not address it here.

ment specious. The uncontradicted testimony indicated that Talley at all times knew that Young was an FBI agent. For example, in the tape recorded conversation, Talley referred to Young as a "fed," and at sentencing, Talley admitted that he had known Young for several years prior to the actions giving rise to this case. Moreover, as the government points out, Talley's conviction was for solicitation to kill an FBI agent in violation of 18 U.S.C. § 1114, and the jury instructions required that the government prove that Talley did so while the agent was engaged in or on account of the performance of his official duties. Indeed, the very reason that Young was a witness was *because* of his official status as an FBI agent investigating Talley's case. Moreover, common sense dictates that Talley would want to eliminate Young because Young, in performing his duties as a government official, had obtained incriminating information and would therefore be able to testify against Talley regarding criminal charges. Thus, Talley was not motivated by mere personal animus, but specifically by the desire to eliminate an FBI agent who could testify against him at trial. Finally, adopting Talley's argument would render § 3A1.2(a) a nullity in the myriad situations in which a government official is also a witness at trial.

 We further note that there was no double-counting, argued briefly by Talley on appeal, because the commentary to § 3A1.2 expressly provides that the enhancement should not apply if the offense guideline specifically incorporates the factor of the victim being an official. *See* U.S.S.G. § 3A1.2, cmt. 3; *United States v. Fann,* 41 F.3d 1218, 1218 (8th Cir.1994) ("Nothing in section 3A1.2 or its commentary precludes the enhancement when an element of the offense is the victim's official status."); *United States v. Woody,* 55 F.3d 1257, 1274 (7th Cir.1995) (§ 3A1.2(a) increase is not double-counting because that section "requires a higher level of culpability, *i.e.,* the defendant's actions must have been motivated by the victim's official status") (internal quotation marks and citation omitted). The offense guideline for the crime of solicitation, U.S.S.G. § 2A1.5 (conspiracy or solicitation to commit murder), does not account for the victim being an official, and accordingly no double counting has occurred.

*Fann,* 41 F.3d 1218–19 (examining the interaction between U.S.S.G. §§ 2A6.1 (threatening communications) and 3A1.2(a) and rejecting defendant's double-counting argument). Based on the foregoing, we find that the district court did not err in enhancing the base offense level under U.S.S.G. § 3A1.2(a).

### III.

We have considered all of defendant's arguments on appeal and find no grounds for reversal. Accordingly, we affirm Talley's conviction and sentence.