**NOT RECOMMENDED FOR PUBLICATION**
File Name: 05a0713n.06
Filed: August 16, 2005

**NO. 04-4167; 04-4169**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>    *Plaintiff-Appellee,*<br><br>v.<br><br>SUMPTER A. MILLER,<br>    *Defendant-Appellant.* | )<br>)<br>)<br>) ON APPEAL from the United<br>) States District Court for<br>) the Southern District of<br>) Ohio at Dayton.<br>)<br>)<br>) |

Decided and Filed _____, 2005.

**Before: COOK and DAUGHTREY, Circuit Judges; and HOOD, District Judge.**[*]

HOOD, District Judge.  Following a jury trial in Case No. 3:03-cr-84, Defendant-Appellant Sumpter A. Miller ("Miller") was convicted of possessing with the intent to distribute in excess of five grams of crack cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).  After denying Miller's motion for acquittal or, in the alternative, for a new trial, the district court sentenced him to a term of 92 months

---

[*]The Honorable Joseph M. Hood, Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

imprisonment. In a second case, Case No. 3:03-cr-45, Miller pled guilty to one count of conspiracy to possess with the intent to sell a motor vehicle knowing its identification number had been tampered with, in violation of 18 U.S.C. § 371. The district court adopted the sentencing calculations made in the Presentence Investigation Report ("PIR") and sentenced Miller to 21 months imprisonment to be served concurrent to his sentence in Case No. 3:03-cr-84.

On appeal, Miller argues that the district court erred in Case No. 3:03-cr-84 by admitting officers' out-of-court statements and in denying his post-conviction motion. Further, Miller seeks vacation of his sentence in Case No. 3:03-cr-45 under *United States v. Booker*, 125 S. Ct. 738 (2005). For the reasons stated below, we **AFFIRM** Miller's conviction in Case No. 3:03-cr-84. Additionally, based on the concurrent sentence doctrine, we **DECLINE TO ENTERTAIN** Miller's *Booker* argument.

**FACTUAL AND PROCEDURAL HISTORY**

Case No. 3:03-cr-45

On March 19, 2003, a federal grand jury returned a twenty-three count indictment against Miller and nine co-defendants. Miller was charged with one count of conspiracy to buy, receive, possess and obtain control of, with the intent to sell, motor vehicles knowing that the identification numbers for such vehicles had been removed, obliterated, tampered with and altered, in

2

violation of 18 U.S.C. § 371, and two substantive counts of the underlying offense, in violation of 18 U.S.C. § 2321(a) and 18 U.S.C. § 2.

On May 26, 2004, Miller appeared with counsel and entered a plea of guilty to Count 1 of the indictment; the United States dismissed Counts 8 and 16. The plea of guilty was made pursuant to a written plea agreement between Miller and the United States.

On September 10, 2004, Miller was sentenced. The district court adopted the sentencing calculations made in the PIR and sentenced Miller to a term of 21 months imprisonment to be served concurrent to the sentence in Case No. 3:03-cr-84. Miller filed a timely notice of appeal.

Case No. 3:03-cr-84

On July 8, 2003, a federal grand jury returned an indictment charging Miller with one count of possessing with the intent to distribute in excess of five grams of crack cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). On July 16, 2003, Miller appeared with counsel and entered a plea of not guilty to Count 1 of the indictment.

The matter proceeded to trial on February 23, 2004. At trial, Dayton Police Detective Becky Rose ("Det. Rose") testified that on April 16, 2003, at approximately 7:00 p.m., she received a telephone call at her residence from Dayton Police Sergeant Dennis Cheney ("Sgt. Cheney"). Det. Rose testified that Sgt. Cheney

3

provided her with information regarding Miller's whereabouts; apparently, Sgt. Cheney received this information from FBI Special Agent Peter Lakes ("Special Agent Lakes"). As a result of this telephone call, Det. Rose contacted Special Agent Lakes directly. Det. Rose testified that Special Agent Lakes also provided her with information relating to Miller. In response to her conversation with Special Agent Lakes, Det. Rose made a broadcast over her portable radio advising dispatch that she had information on a wanted person. Det. Rose provided Miller's name, a possible location, the make and model of a vehicle he was thought to be in, and a clothing description. Specifically, Det. Rose stated that Sumpter Andropolis Miller was at the Food City on Germantown, sitting in a blue GMC Yukon, and wearing a white T-shirt.

After hearing the radio broadcast, Officer Chris Smith ("Officer Smith") responded to the location and confirmed to dispatch that defendant Miller was seated in the passenger seat of a blue Yukon parked next to Food City. Officer Smith observed Miller as he drove past Food City at approximately 20-25 miles per hour. Officer Smith testified that he was able to identify Miller because, prior to the start of his shift, he had reviewed the district's current wanted fliers, one of which featured Miller, and because of prior contacts with Miller. Officer Smith radioed dispatch advising that he had located Miller; he gave his location so that other crews could respond. Officer Smith continued past

4

Miller's location to await additional crews to assist in the arrest.

Officer Mark Ponichtera ("Officer Ponichtera"), having heard both Det. Rose's and Officer Smith's radio broadcasts, and being familiar with Miller, immediately headed to Officer Smith's location. Both officers then proceeded back to the Food City location, coordinating their approach. As they drove into an alley adjacent to Food City, Officers Smith and Ponichtera observed Miller standing outside the passenger side door of the Yukon. Upon the officers' arrival, Miller fled. Officer Ponichtera followed on foot while Officer Smith attempted to pursue Miller in his cruiser.

Miller crossed Germantown and headed toward the Desoto Bass housing project which was directly across the street. With Officer Ponichtera chasing him, Miller ran into a building that housed the community center of the complex. By this time Officer Smith had exited his vehicle and joined the foot pursuit. Once inside the community center, the officers observed Miller run out the exit door of the storage room in the back of the building. The chase continued through the housing complex until Officer Ponichtera was able to apprehend Miller after he unsuccessfully attempted to jump a fence. Once detained, Officer Smith placed Miller under arrest on the March 2003 federal charges and patted him down for safety. Officer Smith recovered approximately $1,200.00 in cash from Miller's left front pant pocket, and a set of car keys from his

5

right front pant pocket. A subsequent inventory audit established that the cash amounted to $1,120.00 and was made up of 3 fifty-dollar bills, 31 twenty-dollar bills, 17 ten-dollar bills, 35 five-dollar bills, and 5 one-dollar bills. Officer Smith took possession of the money and the keys and, at the direction of Det. Rose, transported Miller downtown to the Safety Building.

In the meantime, Officer Ponichtera retraced his steps back to the parking lot of Food City where he met up with Officers Ferdelman and Gross who had heard the radio broadcasts and were securing the Yukon. Once Officer Ponichtera arrived, he contacted Det. Rose who advised him to have the vehicle towed to the First District's secured lot. Det. Rose also asked Officer Ponichtera to inventory the vehicle. While Officer Ponichtera was unable to inventory the vehicle because the doors to the vehicle were locked, the windows were rolled up, and the tow truck driver did not have a slim jim tool, he did have the car towed to the First District location, as instructed.

Back at the Safety Building, the cash found on Miller was logged into the police department's evidence room, and the keys were turned over to Det. Rose. Det. Rose asked Miller whether or not the keys belonged to the Yukon, to which Miller replied, "What Yukon?". When Det. Rose explained that she was referring to Miller's mother's blue Yukon, Miller did not respond. After the interview, Det. Rose secured the keys in the locked drawer of her

6

Safety Building office desk.

The next day, April 17, 2003, Det. Rose made arrangements with an evidence technician to gain access to the secure garage where the Yukon had been towed in order to inventory the vehicle. Det. Rose retrieved the keys taken from Miller the previous evening and, accompanied by Detective Mike Auricchio ("Det. Auricchio"), traveled to the First District garage. Upon completing an inspection of the exterior of the vehicle, Det. Rose unlocked the driver's side door using one of the keys taken from Miller the previous night. Having gained access to the vehicle, Det. Rose climbed into the vehicle via the driver's side door and reached across the car to unlock the passenger side door for Det. Auricchio. When doing this, Det. Rose observed a clear plastic baggie containing what appeared to be crack cocaine in the console area of the Yukon. Upon further inspection of the vehicle, the detectives observed a small pocket scale with white powder residue on it, a second plastic baggie containing what appeared to be crack cocaine, two men's leather jackets, and a box of clear plastic sandwich bags. The scales and baggies containing the white powder were secured and submitted to the Miami Valley Regional Crime Laboratory where they tested positive for crack cocaine.

Det. Rose testified that, after finding the above-mentioned items, she suspended her inventory of the vehicle until the next day, leaving the vehicle unlocked with the keys in the ignition.

7

Det. Rose testified that, while she did not start the vehicle, a key from the set taken from Miller the night before did in fact fit into the ignition. The vehicle was towed to Summit Tow Yard.

Det. Rose traveled to Summit Tow Yard the next day to finish her inventory of the Yukon. Det. Rose testified that, upon arriving at the yard, she retrieved the keys she'd left in the Yukon the previous evening - the same keys taken from Miller on April 16, 2003 - from the front office. Det. Rose was also provided with three additional keys Summit Towing had found inside the vehicle. These keys were placed on a separate key ring. After unsuccessfully trying to open the locked doors of the vehicle with the keys she had used the night before and the additional keys that were found inside the vehicle, Det. Rose gained access to the Yukon by asking one of the tow truck drivers to slim jim it for her. Upon gaining access to the Yukon, Det. Rose completed her inventory of the vehicle. On this occasion, Det. Rose recovered, among other items, a photo of Miller and his girlfriend, Brandi Webster ("Webster"), Webster's Trotwood High School ID card, and Webster's Blockbuster rental card. In the glove compartment of the vehicle, Det. Rose found the title and registration, which indicated that the Yukon was owned by Angela T. Miller, Sumpter Miller's mother.

To further support its position that Miller was in control of the 1994 blue GMC Yukon on the night in question, the government called Detective Rob Rike ("Det. Rike") to testify about a prior

8

incident involving Miller.  Det. Rike testified that on December 13, 2001, in Dayton, Ohio, he and other officers issued a citation to Miller for reckless operation, driving without an operator's license, and driving under suspension.  The vehicle Miller was operating was a 1994 blue GMC Yukon.  Det. Rike further testified that, during the attempted traffic stop, Miller jumped from the moving vehicle and fled.  After catching up to and apprehending Miller, Det. Rike placed him under arrest for the above-mentioned traffic offenses and performed a custodial search.  In performing the search, Det. Rike retrieved a baggie of marijuana from Miller's sweatshirt pocket.  During an inventory of the vehicle -  the 1994 blue GMC Yukon - officers recovered a GAP shopping bag that contained eight bags of bulk marijuana and one bag containing 20 individually packaged ziploc baggies of marijuana.  Two additional baggies of marijuana were recovered from the driver's door pocket.

In response to the government's evidence that Miller was in control of the Yukon on April 16, 2003, defense witness, Victor Randall Schuyler, an assistant parts manager employed by Bob Ross Buick, testified that the keys found on Miller, the same keys that Det. Rose allegedly used to open the door to the Yukon and insert into the ignition switch, were not in fact keys to a 1994 GMC Yukon ignition cylinder.  The defense also called Antwan Ingram, a friend of Miller's who testified that, on April 16, 2003, he had borrowed the vehicle in question from Angela Miller and was at Food City

9

with Miller's brother, George Miller.

On March 3, 2004, the jury returned a guilty verdict. Subsequently, on May 26, 2004, counsel for Miller filed a motion for judgment of acquittal, or in the alternative, for a new trial pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure. Finding that there was sufficient evidence from which a jury could conclude that the drugs found and recovered in the Yukon were possessed by Miller, the district court denied Miller's motion by order dated September 14, 2004. Miller was sentenced to a term of 92 months imprisonment to be served concurrent to his sentence in Case No. 3:03-cr-45. A timely notice of appeal was filed.

## ANALYSIS

### I.   Sufficiency of the Evidence/Manifest Weight of Evidence

In his first assignment of error, Miller contends that the trial court erred by denying his motions for judgment of acquittal and for a new trial when there was insufficient evidence to support the conviction and the verdict was contrary to the weight of the evidence. Whether viewed under a sufficiency of evidence standard, *Jackson v. Virginia,* 443 U.S. 307, 319 (1979), or a manifest weight of evidence standard, *United States v. Ashworth,* 836 F.2d 260, 266 (6th Cir. 1988), Miller contends that the evidence that he constructively possessed crack cocaine was inadequate to support a conviction.

10

When considering a challenge to the sufficiency of evidence to sustain a conviction on direct appeal, the relevant question is whether,... "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319(emphasis in original). The Court must view all evidence and resolve all reasonable inferences in favor of the government. *Id; see also, United States v. Searan,* 259 F.3d 434, 441 (6th Cir. 2001). Because the issue is one of legal sufficiency, the Court may neither "independently weighs the evidence, nor judges the credibility of witnesses who testified at trial." *United States v. Talley,* 164 F.3d 989, 996 (6th Cir. 1999). Neither may the Court substitute its judgment for that of the jury. *United States v. Hilliard,* 11 F.3d 618, 620 (6th Cir. 1993). Finally, it must be remembered that "circumstantial evidence alone can sustain a guilty verdict and ... [such] evidence need *not* remove every reasonable hypothesis except that of guilt." *United States v. Stone,* 748 F.2d 361, 362 (6th Cir. 1984).

In reviewing the denial of a motion for a new trial under Fed. R. Crim. P. 33, an appellate court is "limited to examining the evidence produced at trial to determine whether the district court's determination [that the verdict is not against the manifest weight of evidence] was a clear and manifest abuse of discretion." *Ashworth,* 836 F.2d at 266 (citations omitted). Unlike the district court, the appellate court does not sit as a "thirteenth juror" to

11

judge the credibility of witnesses and weigh the evidence. *Id.*

In order to convict a defendant under 21 U.S.C. § 841(a)(1), the government must prove beyond a reasonable doubt that the defendant (1) knowingly, (2) possessed a controlled substance, (3) with intent to distribute it. *United States v. Jackson,* 55 F.3d 1219, 1225 (6th Cir. 1995) (citing, *United States v. Peters,* 15 F.3d 540, 544 (6th Cir. 1994)). Miller argues that the evidence presented at trial was insufficient to establish the second of the three elements - that he possessed a controlled substance, to wit, crack cocaine. In the context of criminal law, possession can be shown through knowingly having dominion and control over an object. *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir. 1973). This theory has come to be known as "constructive possession," and numerous courts have relied on it to support convictions for illegal possession of controlled substances. *See United States v. Gibbs,* 182 F.3d 408, 424 (6th Cir. 1999)(holding that the government is not required to prove actual possession of a controlled substance, because constructive possession is sufficient to establish a violation of §§ 841(a)(1)); *see also United States v. Hill,* 142 F.3d 305 (6th Cir. 1998); *United States v. Reed,* 141 F.3d 644 (6th Cir. 1998). Like actual possession, constructive possession may be proved by circumstantial evidence. *Craven,* 478 F.2d at 1333.

At trial the government offered evidence tending to prove the

12

following facts:

(1) Immediately prior to the officers' arrival at Food City, Miller was the sole occupant of the 1994 blue GMC Yukon;

(2) No one else was seen in the vehicle at any time;

(3) When the officers arrived, Miller fled;

(4) When Miller was apprehended, officers recovered approximately $1,200.00 in small denominations;

(5) The 1994 blue GMC Yukon was owned by Miller's mother;

(6) Miller's girlfriend's personal belongings were found in the 1994 blue GMC Yukon; and,

(7) Miller had prior connections with the 1994 blue GMC Yukon.[1]

Taken together, the above facts provide ample evidence for a rational juror to conclude that Miller "possessed" the crack cocaine found in the 1994 blue GMC Yukon.

The government's evidence, however, did not go unanswered. The defense rebutted the government's position that Miller was the only one in the vehicle on the night in question with testimony

---

[1] In admitting this 404(b) evidence, the Court admonished the jury to use it only for the limited purpose of proving the element of "intent to distribute." (J.A. at 1245.) The Court made clear that the jury was not to use evidence of Miller's prior drug sales out of the 1994 blue GMC Yukon as evidence that he "possessed" the crack cocaine found in the 1994 blue GMC Yukon on April 16, 2005. (J.A. at 1245.) Accordingly, while the government contends that this evidence is indicative of guilt, the defendant is correct in asserting that it cannot be a basis to support the government's position that Miller possessed the crack cocaine recovered from the vehicle.

from Antwan Ingram. Ingram testified that he had driven the vehicle to the Food City location on April 16, 2003, and that George Miller, Defendant's brother, was in the front passenger seat that night. The defense also presented evidence that the keys found on Miller on April 16, 2003, were not the keys to the 1994 blue GMC Yukon. Counsel for Miller argues that the government presented insufficient evidence to establish that Miller exercised dominion and/or control over the drugs found in the vehicle and that Miller's mere proximity to the vehicle is not enough to sustain a conviction. While defense counsel's statement regarding proximity is accurate, the jury in this case drew acceptable inferences from the evidence presented to find that the drugs found in the 1994 blue GMC Yukon belonged to Miller and were under his dominion and control. Jurors are entitled to choose from among reasonable constructions of evidence of drug possession presented at trial. *See United States v. Forrest,* 17 F.3d 916, 919 (6th Cir. 1994).

From an examination of all the evidence adduced at trial, viewed in the light most favorable to the government, we conclude that a reasonable jury could have found beyond a reasonable doubt that Miller possessed with the intent to distribute in excess of five grams of crack cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). For the same reasons, we find that the district court did not abuse its

14

discretion in finding that the verdict was not against the manifest weight of the evidence.

## II.  Evidentiary Rulings

Miller's second assignment of error relates to the admission of statements made by Sgt. Cheney and Agent Lakes to Detective Rose regarding Miller's location on the night in question.  Miller asserts that the district court erred in allowing Det. Rose to testify to the content of her conversations with Sgt. Cheney and Agent Lakes and in allowing Officers Smith and Ponichtera to testify about Det. Rose's radio broadcast.

Ordinarily, a district court's evidentiary determinations are reviewed under an abuse of discretion standard.  *Gibbs,* 182 F.3d at 429.  However, when a party objects to the admission of evidence on specific grounds in the trial court, but on appeal asserts different grounds for challenging the admission, the court reviews for plain error.  *United States v. Evans,* 883 F.2d 496, 499 (6th Cir. 1989) (citing, *United States v. Johnson,* 772 F.2d 407, 409 (8th Cir. 1983)).  At trial, Miller objected to the admission of Sgt. Cheney's and Agent Lakes' out-of-court statements based on hearsay.[2]  In his Rule 29/33 motion, the same evidence was objected to on the basis of a Sixth Amendment confrontation clause

---

[2]The objection was overruled.  The district court found that the statements were not being admitted for the truth of the matter asserted, but rather to explain Det. Rose's actions in response to the information received.

violation.[3]  (J.A. at 157.)  Nowhere below, however, did Miller raise the argument that he now raises in this appeal, namely that admitting the statements into evidence violates Rule 403 of the Federal Rules of Evidence.  Accordingly, this Court will review the evidentiary ruling for plain error.  "To establish plain error, a defendant must show that: (1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected the defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings."  *United States v. Emuegbunam,* 268 F.3d 377, 406 (6th Cir. 2001).

Federal Rule of Evidence 403 permits the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice.  Viewing the record as a whole, it cannot be said that the district court's admission of this now-disputed testimony rises to the level of plain error.  Sgt. Cheney's and Agent Lakes's out-of-court statements regarding Miller's location was integral in explaining to the jury how and why Miller was apprehended.  Furthermore, Officer Smith's and Ponichtera's testimony regarding Det. Rose's radio broadcast informed the jury how the Officers became involved in the case and

_____

[3]When an out of court statement is not offered to prove the truth of the matter asserted, the Confrontation Clause is not implicated.  *Tennessee v. Street,* 471 U.S. 409, 413-414 (1985); *United States v. Martin,* 897 F.2d 1368, 1372 (6th Cir. 1990).

how, ultimately, as a result of Miller's apprehension, the crack cocaine was discovered and seized from the Yukon. It is clear from the record that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice under Rule 403.

Accordingly, based on a review of the record, we find that the district court did not plainly err in admitting the testimony to which the defendant now objects.

### III. Application of the Sentencing Guidelines

Finally, Miller contends that the district court erred in determining his offense level for sentencing purposes in Case No. 3:03-cr-45. Specifically, Miller challenges the application of two sentence enhancements that resulted in his base offense level of eight being raised to an offense level of twelve. These enhancements were made pursuant to sections 2B6.1(b)(1)(B) and 2B6.1(b)(3) of the Guidelines. Miller objects to the enhancements, arguing that they were based on facts neither proved to a jury nor admitted by Miller.

While this case was pending on appeal, the Supreme Court issued its decision in *United States v. Booker.* "In *Booker*, the Supreme Court concluded that the Sixth Amendment prevents federal judges from making factual determinations that increase a defendant's sentence on the basis of facts not reflected in the jury's verdict." *United States v. Davidson,* 409 F.3d 304, 309 (6th

17

Cir. 2005) (citing *Booker,* 125 S. Ct. at 745-47, 756).  Further, the Court expressly stated that its decision in *Booker* must be applied "to all cases on direct review."  *Booker,* 125 S. Ct. at 769.  Because the case *sub judice* was pending on direct review when *Booker* was decided, the holdings of *Booker* are applicable.

In the case *sub judice*, the district court relied on judge-found facts to apply two sentence enhancements - a two level enhancement under section 2B6.1(b)(1)(B) based upon its determination that the combined retail value of the vehicles was in excess of $5,000.00, and a four level enhancement under section 2B6.1(b)(3) based upon its determination that the offense involved an organized scheme to steal vehicles or vehicle parts.  Thus, based on facts that were neither presented to a jury nor admitted by Miller, the applicable sentencing range was increased from a base offense level of eight to an offense level of twelve resulting in a 21-month sentence.  The district court ordered that the sentence was to run concurrent to the 92-month sentence handed down in Case No. 3:03-cr-84.

Although not briefed, we believe (and appellant's counsel conceded at oral argument) that the concurrent sentence doctrine, which is a discretionary doctrine, applies to the issue *sub judice*. *See Benton v. Maryland,* 395 U.S. 784, 787-93 (1969); *Barnes v. United States,* 412 U.S. 837, 848, n.16 (1973); *Dale v. Haeberlin,* 878 F.2d 930, 935, n.3 (6th Cir. 1989).  A court should exercise

18

its discretion not to review an issue where it is clear that there is no collateral consequence to the defendant and the issue does not otherwise involve a significant question meriting consideration. *Dale,* 878 F.2d at 935 n.3. Having upheld Miller's conviction in Case No. 3:03-cr-84, and considering Miller received a concurrent and longer sentence on that count, the concurrent sentence doctrine allows the Court to decline to address Miller's sentencing challenge. *See United States v. Smith,* 601 F.2d 972, 973-74 (8th Cir. 1979). (The concurrent sentence doctrine permits courts to avoiid reaching the merits of a claim attacking fewer than all multiple concurrent sentences if success on the claim would not change the term of imprisonment.). Because the challenged sentence runs concurrently with the sentence in Case No. 3:03-cr-84, the challenged sentence has no harmful impact on Miller's prison term. Additionally, because there is no likely collateral consequence, we find no significant legal issue to compel our attention. Accordingly, while noting that affirmance of Miller's conviction in Case No. 3:03-cr-84 does not moot the issues he raises as to the alleged sentencing violations in Case No. 3:03-cr-45, *Dale, 878 F. 2d 935 n.3,* pursuant to the collateral sentence doctrine, we decline as a discretionary matter to reach them.

## CONCLUSION

For the reasons stated herein, we **AFFIRM** the judgment of the district court in Case No. 3:03-cr-84. Additionally, based on the

concurrent sentence doctrine, we **DECLINE TO ENTERTAIN** Miller's

*Booker* argument.