NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0701n.06
Filed: September 27, 2006

No. 05-6932

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff - Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| HAROLD G. HANKINS, | ) | WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendant - Appellant. | ) | |
| | ) | |

Before: GUY, SUTTON, and ALARCÓN[*], Circuit Judges.


PER CURIAM. Harold G. Hankins appeals from the judgment entered following his

conviction by a jury of each of the crimes alleged in the superceding indictment.[1] Mr. Hankins

claims that the evidence presented at trial was insufficient to support his conviction. Mr.

Hankins also asserts that the District Court erred in denying his motion to suppress audio tapes

---

[*]The Honorable Arthur L. Alarcón, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

[1]Count Seven of the superceding indictment, which sought forfeiture of property derived from the manufacture of marijuana plants pursuant to 21 U.S.C. § 53, was dismissed on the Government's motion.

from being admitted into evidence.[2] We affirm the judgment because we conclude that the

evidence was sufficient and the District Court did not err in admitting the taped conversations.

## I

The evidence, viewed in the light most favorable to the Government as the prevailing

party at trial, reveals that in July 2004, a confidential informant told the South Central Kentucky

Drug Task Force that Mr. Hankins was growing marijuana on his property. On July 27, 2004,

Detective Kevin Bibb of the South Central Kentucky Drug Task Force investigated the tip and

discovered marijuana growing in a wooded area on a remote part of Mr. Hankins' property. A

trail made by a four-wheel all-terrain vehicle led from the marijuana plants to Mr. Hankins'

home. After discovering the marijuana, Detective Bibb obtained a warrant to search Mr.

Hankins' home and surrounding property.

Officers from the South Central Kentucky Drug Task Force, the Bureau of Alcohol

Tobacco and Firearms, the Kentucky State Police, and the Logan County Sheriff's Department

jointly searched Mr. Hankins' home on July 27, 2004. Mr. Hankins was at home when the law

---

[2]Mr. Hankins has not appealed from the judgment of conviction on Count One, 21 U.S.C. § 841(a)(1) (Intentionally Manufacturing More Than 100 Marijuana Plants) or Count Two, 18 U.S.C. § 924(c)(1)(A) (Possessing a Firearm in Furtherance of a Drug Trafficking Crime).

enforcement officers arrived. He was arrested after Detective Bibb discovered a bag of marijuana and 1.5 papers used to form a marijuana joint in his kitchen cabinet. A subsequent search disclosed two plots of marijuana growing directly behind the home, one behind the garage, and another adjacent to a nearby horse shed. Plastic cups, Miracle-Gro, twine, and a spray bottle were discovered and seized next to the marijuana plots. Officers also seized weighing scales, plastic ziplock bags, a shotgun, a rifle, a revolver, ammunition, and Mr. Hankins' truck. In total, 212 marijuana plants were seized worth approximately $400,000.

Two days after the raid, Mr. Hankins went over to the South Central Kentucky Drug Task Force office to retrieve some items from his truck. Detective Bibb accompanied Mr. Hankins to the truck. Mr. Hankins' withdrew $2000 in cash hidden behind the backseat. Detective Bibb took the money and instructed Mr. Hankins to speak with Director Jim Devasher of the South Central Kentucky Drug Task Force about getting it back. Director Devasher asked Mr. Hankins about the source of the money. Mr. Hankins claimed that the cash was the proceeds from the sale of some farm equipment. Upon further questioning, Mr. Hankins could not remember the buyer's name. Mr. Hankins also admitted growing marijuana in the past. Director Devasher refused to return the money to Mr. Hankins.

Subsequently, Mr. Hankins contacted James Chick. Mr. Chick and Mr. Hankins had been

friends for over twenty years, and Mr. Hankins frequently ate at Mr. Chick's restaurant.

Unbeknownst to Mr. Hankins, Mr. Chick had been caught selling cocaine, and rather than serve

jail time, agreed to work as an informant for Special Agent David Hayes of the Bureau of

Alcohol, Tobacco, Firearms, and Explosives. Mr. Chick testified that he was approached by Mr.

Hankins "[p]robably because of my reputation. Everybody thinks I'm - because I'm from

Detroit, I was raised, you know, with Italians, and they thought I was affiliated with them, which

I'm not. I'm just friends." Mr. Hankins said that "he had $20,000 to give to someone" if they

were willing to come to Kentucky and kill Director Devasher. At first Mr. Chick "really didn't

take him serious" but when Mr. Hankins appeared to be "very serious," Mr. Chick contacted

Agent Hayes.

Agent Hayes asked Mr. Chick to get Mr. Hankins to repeat his threats on tape. Mr. Chick

agreed and was outfitted with a concealed microphone transmitter. Mr. Chick wore the

transmitter when he was a guest in Mr. Hankins' home on three separate occasions. His

conversations with Mr. Hankins were secretly transmitted to Agent Hayes and recorded by him.

Mr. Hankins threatened to kill and cripple Director Devasher during his conversation

with Mr. Chick on November 9, 2004, and November 18, 2004. On November 9, 2004, Mr.

Hankins stated: "if I lost this place and everything that they want, I'll kill [Director Devasher],

myself. . . . I've got three fucking years, I'm eighty-four, to live. So, go ahead and put me there. I can tough it out. . . . what the fuck have I got to lose." He also said that he wanted Director Devasher "crippled. . . . So, he can tell, so people can see." On November 18, 2004, Mr. Hankins said that he would like to shoot Director Devasher "myself. And, if I could catch him at the right place, I would. . . . You've got to catch him . . . as he goes in his house or . . . as he gets out of his car somewhere like if he was out yonder at the radio station. You [could hide in the] woods up there with a high powered rifle. . . . And, shoot the son of a bitch."

Mr. Hankins also threatened to kill and cripple Sheriff Wallace Whittaker during his November 9, 2004, and November 16, 2004 conversations with Mr. Chick. On November 9, 2004, Mr. Hankins said that he could not believe that Sheriff Whittaker did not inform him before the raid especially since Mr. Hankins had given Sheriff Whittaker "five hundred dollars" for "his electioneering" and also had given him "tomatoes, oranges, grape fruits . . . all kinds of fish . . . jerky at least a half a dozen times" without ever charging him. Mr. Hankins stated that "I'd just as soon that mother fucker [Sheriff Whittaker] get shot as, as god damn Devasher." On November 16, 2004, Mr. Hankins told Mr. Chick "let me tell you something, between me and you. I could go up yonder and kill Wallace Whittaker tomorrow. Kill him. Right in his fucking office." Mr. Hankins also told Mr. Chick that "[m]e and you both need him crippled . . .

[because] it's going to help me, you and all the rest of the god damned pot growers . . . it's going

to say these mother fuckers 'I'm doing wrong.'" Mr. Hankins said that he could "kill [Sheriff

Whittaker] myself... [a]nd, kill him just as easy as that."

Mr. Hankins discussed hiring a murderer from Detroit to shoot Director Devasher and

Sheriff Whittaker on November 9, 2004 and November 16, 2004. On November 9, 2004, Mr.

Chick first brought up the topic of hiring a murderer. Mr. Hankins responded that he was not

sure where Director Devasher lived, but claimed that "[w]e got to find all that shit out." Mr.

Hankins knew that Director Devasher "preaches out yonder at the radio station every Sunday

morning. But, that wouldn't be a good place" to shoot him. Mr. Hankins said that after the

murder, people would expect that he was "involved[,]" so he "need[ed] to be somewhere else."

Mr. Hankins told Mr. Chick that "[w]hatever money is transferred, will be transferred to

you . . . and you only." Mr. Hankins said that he wanted Director Devasher "shot before I give

[the Detroit shooter] any money." Mr. Hankins wanted Director Devasher's "legs shot out from

under him" and "hospitalized from the god damned . . . bullet wound." After Mr. Chick claimed

that the killer was experienced and "ain't never been caught," Mr. Hankins replied, "Good. If he

don't get caught, I'm not going to get caught. Nobody else is going to get caught. . . . I'd give

twenty thousand to get [Director Devasher] killed, but I don't . . . want him killed. I want him

crippled." Mr. Hankins said that he had "the fucking money buried" and wanted the Detroit

shooter to "plan a time where I'll be away from here . . . [so] they can't pin nothing on me."

On November 16, 2004, Mr. Chick asked Mr. Hankins if he was serious, and Mr.

Hankins replied "don't you think for fuck . . . one fucking minute that I'm saying a God damned

word that I don't mean. . . . Because I mean it all." Mr. Hankins told Mr. Chick that he was

"[d]amned serious, but, I'll kill [Director Devasher] myself if I have to." Mr. Hankins also said

that he wanted to "talk to [the] man... [to find out what kind of] chances have I got to get

caught.'"

On November 18, 2004, Mr. Hankins told Mr. Chick to call the Detroit shooter off. Mr.

Hankins initially said that he wanted to leave town when the shooting took place so that he

"wouldn't need no alibi." Later in the conversation, he instructed Mr. Chick to tell the shooter

"I'm going to call it off right now." Mr. Hankins said that he hoped that Mr. Chick did not "feel

hard" at him for "getting you to go to this kind of trouble." Mr. Hankins said that he "need[ed]

more time" and wanted to "hold off on it for a while."

Mr. Hankins stated on November 9, 2004, and November 16, 2004 that he had been

drinking. On November 9, 2004, Mr. Hankins stated that he "just got home" and "drank nearly

half a pint [of alcohol] coming home." During the beginning of the conversation, Mr. Hankins poured himself a "little drink" with "a chaser." Mr. Hankins also asked Mr. Chick to have a drink, and Mr. Chick said he would have a "very small one." On November 16, 2004, Mr. Hankins said that he was "[j]ust about drunk" and that he "don't lack much of being drunk."

Before the trial, the District Court denied Mr. Hankins' motion to suppress the recordings and his motion for judgment of acquittal. Mr. Hankins renewed those motions at trial. The District Court again denied them. Mr. Hankins was subsequently convicted and sentenced to 322 months imprisonment. Mr. Hankins filed a timely appeal.

**II**

Mr. Hankins contends that the evidence at trial was insufficient to sustain his convictions for threatening to retaliate against Director Devasher and Sheriff Whittaker. A district court's denial of a motion for a judgment of acquittal, based on insufficient evidence to sustain a conviction, is reviewed *de novo*. *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996) (*citing United States v. Gibson*, 896 F.2d 206, 209 (6th Cir. 1990)). "In deciding whether the evidence is sufficient to withstand a motion for an acquittal, and support a conviction, the court views all evidence in the light most favorable to the prosecution and determines whether there is any

evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999) (*citing United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996)). In making this determination, this Court will not independently weigh the evidence or judge a witness' credibility. *Id.* (citing *Welch*, 97 F.3d at 148.)

Counts Three and Four of Mr. Hankins' indictment charged him with violating 18 U.S.C. § 1513(b). To establish a violation of 18 U.S.C. § 1513(b), the government must prove: (1) the defendant threatened bodily injury against another person, and (2) the defendant intended to retaliate against that person for his involvement with an official proceeding. 18 U.S.C.A. § 1513(b) (West 2006). The Government is not required to prove that the defendant was successful "in actually achieving the result" because "it is the endeavor to bring about [the] forbidden result . . . that is forbidden." *United States v. Maggitt*, 784 F.2d 590, 593 (5th Cir. 1986) (*citing United States v. Jackson*, 513 F.2d 456, 460 (D.C. Cir. 1975); *United States v. De Stefano*, 476 F.2d 324, 330 (7th Cir. 1973)).

A reasonable juror could find that Mr. Hankins made the statements to Mr. Chick because he wanted to retaliate against Director Devasher and Sheriff Whittaker for their involvement in Mr. Hankins' criminal proceedings. They were sufficient to sustain Mr. Hankins' conviction for threatening to retaliate.

Mr. Hankins also contends that the evidence at trial was insufficient to sustain his convictions for soliciting another to inflict bodily harm against Director Devasher and Sheriff Whittaker. Counts Five and Six of the indictment charge Mr. Hankins with violating 18 U.S.C. § 373. To establish a violation of 18 U.S.C. § 373, the government must prove that the defendant intended that "another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicit[ed], command[ed], induce[d], or otherwise endeavor[ed] to persuade such person to engage in such conduct." 18 U.S.C.A. § 373(a) (West 2006). One factor strongly corroborating intent is a promised payment or some other benefit to the person solicited. *Talley*, 164 F.3d at 996 (quoting *United States v. Gabriel*, 810 F.2d 627, 635 (7th Cir. 1987)). "'[I]t is *not* a defense to a solicitation charge that, unknown to the solicitor, the person solicited could not commit the crime' . . . or that 'the person solicited is an undercover agent and under no circumstances would have committed the crime solicited.' . . . In order for the crime of solicitation to be completed, '[t]he crime solicited need not be committed.'" *United States v. Devorkin*, 159 F.3d 465, 468 n.2 (9th Cir. 1998) (emphasis in original) (internal citations omitted)(quoting 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 6.1, at 3, 15 n.107 (1986)).

-10-

Mr. Chick testified that Mr. Hankins' demeanor was serious when he approached Mr.

Chick about locating a murderer in Detroit. Mr. Hankins said that, although he would "give

twenty thousand to get [Director Devasher] killed" he had thought about it and only wanted

Director Devasher "crippled," and that he would not "pay [the Detroit shooter] a dime until it's

done." Mr. Hankins also stated that he did not want to pay the Detroit shooter directly and

instead "[w]hatever money is transferred, will be transferred to . . . [Mr. Chick] only." Mr.

Hankins asserted that he was "[d]amned serious." These statements demonstrate that Mr.

Hankins intended to hire someone to commit a violent felony.

Mr. Hankins argues that his statements are protected by the First Amendment because

they are not "true threats." "[T]he First Amendment 'ordinarily' denies a State 'the power to

prohibit dissemination of social, economic and political doctrine which a vast majority of its

citizens believes to be false and fraught with evil consequence.'" *Virginia v. Black*, 538 U.S. 343,

358 (2003) (*citing Whitney v. California*, 274 U.S. 357, 374(1927) (Brandeis, J., concurring)).

However, the Government may punish "true threats" because the First Amendment does not

protect threats of violence. *Id.* at 359; *Watts v. United States*, 394 U.S. 705, 707 (1969) (noting

that "a threat must be distinguished from what is constitutionally protected speech"). The

Government's "prohibition on true threats 'protect[s] individuals from the fear of violence' and

'from the disruption that fear engenders.'" *Black*, 538 U.S. at 360 (*citing R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)).

A true threat is a statement that "an objective, rational observer would tend to interpret, in its factual context, as a credible threat." *United States v. Alkhabaz*, 104 F.3d 1492, 1505 (6th Cir. 1997). *See also Black*, 538 U.S. at 359 (*citing Watts v. United States*, 394 U.S. 705, 708 (1969); *R. A. V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)) (holding that true threats "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"). A statement's context must be considered in determining whether it is a true threat. *Watts*, 394 U.S. at 706-08 (reversing the District of Columbia Court of Appeals and ruling that First Amendment protected defendant's statement that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L. B. J.," shouted during a Washington D.C. political rally). The jury determines whether a statement is a true threat. *United States v. Daughenbaugh*, 49 F.3d 171, 173 (5th Cir. 1995) (explaining that the jury must "determine the nature of the subject communication" and whether it falls within protected speech) (*citing United States v. Malik*, 16 F.3d 45 (2d Cir. 1994)).

Mr. Hankins' statements that he wanted Director Devasher "crippled. . . . So, he can tell,

so people can see" and "hospitalized from the god damned . . . bullet wound," combined with an offer to pay a murderer $20,000 to perform the shooting, can reasonably be interpreted as a serious expression of intent to harm Director Devasher. *See United States v. Velasquez*, 772 F.2d 1348, 1357 (7th Cir. 1985) (holding that "[a] threat to break a person's knees or pulverize his automobile as punishment for his having given information to the government is a statement of intention rather than an idea or opinion and is not part of the marketplace of ideas."). Mr. Hankins' statement that he "could go up yonder and kill Wallace Whittaker tomorrow. Kill him. Right in his fucking office" also can be interpreted as an intent seriously to harm Sheriff Wallace. There was no political context to Mr. Hankins' statements. Instead he made these statements in the privacy of his own home, to a friend, only a few months after being arrested for growing marijuana. *Cf. Watts v. United States*, 394 U.S. 705, 708 (1969) (holding that defendant's statements to a large audience at Washington D.C. anti-war rally were protected by the First Amendment). The violent content of Mr. Hankins' statements, the private location, and the impending criminal trial, support a finding that Mr. Hankins' statements were not protected by the First Amendment.

III

Mr. Hankins next attacks the District Court's refusal to grant his motion to suppress. Mr.

-13-

Hankins claims that his Fourth Amendment rights were violated when the prosecution introduced audio tape recordings that had been transmitted from his home without a warrant or his knowledge or consent. He argues that the recordings should have been excluded from evidence pursuant to *Weeks v. United States*, 232 U.S. 383, 398 (1914). This Court reviews a District Court's factual findings on a motion to suppress for clear error and its conclusions of law *de novo*. *United States v. Leake*, 998 F.2d 1359, 1362 (6th Cir. 1993).

"The Fourth Amendment protects an individual from unreasonable searches and seizures only where the individual can show that: 1) 'he manifested a subjective expectation of privacy in the object of the challenged search[,]' and 2) 'society is prepared to recognize that expectation as legitimate.'" *United States v. Berryhill*, 352 F.3d 315, 316 (6th Cir. 2003) (citing *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1510 (6th Cir. 1988)). "Fruits of unreasonable searches of locations in which an individual can show an actual and reasonable expectation of privacy will be suppressed." *Id.* (*citing Rakas v. Illinois*, 439 U.S. 128, 143 (1978)).

At the Fourth Amendment's core "'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). *See also Hoffa v. United States*, 385 U.S. 293, 301 (1966) ("[T]he Fourth Amendment protects . . . the security a

man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile.").  The Fourth Amendment, however, does not protect a person's "misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa*, 385 U.S. at 302.  *See also United States v. White*, 401 U.S. 745, 749 (1971) (plurality opinion) ("[H]owever strongly a defendant may trust an apparent colleague, his expectations in this respect are not protected by the Fourth Amendment when it turns out that the colleague is a government agent regularly communicating with the authorities.").

A person's Fourth Amendment rights are not infringed if he or she consents to the invasion.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) ("In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence.")*; United States v. Bramble,* 103 F.3d 1475, 1478 (9th Cir. 1996) ("Once consent has been obtained from one with authority to give it, any expectation of privacy has been lost.") (quoting *United States v. Rubio*, 727 F.2d 786, 797 (9th Cir.1983)).  A person may still validly consent to a guest's entry, even if the guest lies about his or her identity or the reasons for the entry.  *Lewis v. United States*, 385 U.S. 206, 209 (1966) ("[I]n the detection of many types of

crime, the Government is entitled to use decoys and to conceal the identity of its agents.") (*citing Grimm v. United States*, 156 U.S. 604, 610 (1895); *Andrews v. United* States, 162 U.S. 420, 423 (1896)).

The surreptitious transmission of a defendant's conversation in his home with an informant to monitoring Government agents does not violate the Fourth Amendment. *On Lee v. United States,* 343 U.S. 747, 751-53 (1952). "If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks." *United States v. White*, 401 U.S. 745, 751 (1971) (plurality opinion). The District Court did not err in admitting the tape recordings.

**IV**

The District Court's judgment is affirmed.