NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0501n.06

No. 23-5706

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Dec 06, 2024

KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| SUZANNE CRAFT, | ) | KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: STRANCH, THAPAR, and MURPHY, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Suzanne Craft appeals her criminal conviction and sentence for mailing racist threats to her neighbors, in violation of 18 U.S.C. § 876(c). Craft first challenges the sufficiency of the evidence as to Count One on the ground that the message in the mailing did not constitute a "true threat." Craft further challenges the district court's decisions to admit evidence of racial slurs used by her preteen daughter and to permit a police officer to testify about the impact of the threats on her neighbors. Finally, Craft asserts that her sentence was procedurally unreasonable because the district court erroneously applied enhancements under USSG § 2A6.1(b)(1) and USSG § 3C1.1. For the reasons that follow, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  Facts

Suzanne Craft lived with her preteen daughter S.W in Lake Forest, a neighborhood in Louisville, Kentucky.  In spring 2019, Connie and Michella Pineda and their children—K.P., S.P.1, S.P.2, D.P., and S.P.3—moved into a neighboring house.[1]  The Pineda children are biracial with differing racial backgrounds, including Black; the eldest children, K.P. and S.P.1, have the darkest skin.

Initially, Craft and the Pinedas got along.  But their friendly relationship did not last.  In May 2019, S.W. referred to K.P. as a "n---er" while speaking with S.P.2.  That night, S.P.2 told Connie and Michella about this interaction, and Connie and Michella instructed their children to stay away from S.W.  Despite this incident, the Pinedas tried to maintain their cordial relationship with Craft.

On March 22, 2020, K.P. and S.P.2 went outside to ride their bikes.  According to K.P. and S.P.2, S.W. repeatedly directed the racial slur "n---let" at them, and she once again called K.P. a "n---er."  K.P. and S.P.2 told Michella what happened, and Michella instructed K.P. to tell S.W. to leave her and her sister alone.  K.P. confronted S.W. and told her to "leave us alone, you racist b---h."  K.P. then returned home.  A few minutes later, Michella and K.P. heard "banging" at the front door followed by someone they believed to be Craft yelling, "S.W., what the f--k did that n---er say to you?"  Michella and K.P., frightened, hid on the ground and crawled past the front door, through the living room and garage, and over to the backyard, where they told Connie what had just transpired.  Later that day, K.P. and S.P.2 returned outside where they were approached

---

[1] When the Pinedas moved into Lake Forest, they had four children.  Shortly after moving in, Michella and Connie had S.P.3, their fifth child.

by Craft. According to K.P. and S.P.2, Craft, who was still in her vehicle, drove up to S.P.2, rolled down her window, and told S.P.2, "Ride on my side of the road and I'll run your ass over." S.P.2, terrified and distraught, told Michella about this threat. Michella confronted Craft, telling her not to "ever say s--t to my kids" and stating that she was "tired of this racist bulls--t."

Shortly thereafter, the Pineda family began to experience a series of alarming incidents of race-based harassment. On June 7, 2020, the Pinedas found the words "Go away n---ers" spraypainted on their driveway in orange paint. Craft also had the words "No N---ers, only whites" spraypainted on her driveway that same day. After this incident, the Pinedas activated their home-security cameras. On June 16, 2020, the Pinedas found the words "No n---ers" and a swastika painted on their driveway. On June 27, 2020, they again found the words "Go n---ers" and a swastika painted on their driveway. In both instances, the Pinedas' home-security camera captured footage of an individual walking from the area of Craft's house to the Pineda family residence and spray-painting their driveway.[2] Michella and Connie believed Craft was the individual in the footage. In response, on July 8, 2020, the Pinedas filed a civil suit against Craft and the Lake Forest Homeowner's Association. In August 2020, while her children were playing outside, Michella heard Craft, who was in neighbor Betty Probst's yard, sing a racist jingle: "N---let, n---let, n---lets hanging in a tree; one for you, Betty, and a n---er for me."

In fall 2020, Michella and Connie found two separate envelopes in plastic bags on their property. One envelope contained a piece of paper with the words "YOU HAD ENOUGH N---eR b---H" in cutout letters from a magazine. Another contained a letter with the message "DIE STUPID B---H MOVE OUT," again in cutout letters from a magazine, along with a piece of a

---

[2] Home-security cameras belonging to Matthew Lanham, the Pinedas' neighbor, also captured footage of both incidents.

Barilla pasta box with the message "DIE B---H," which was also in cutout letters. Reviewing their home-security system, the Pinedas uncovered (1) footage, dated October 18, 2020, showing an individual leaving Craft's garage, walking to the Pinedas' front yard, and placing something in the fountain area; and (2) footage, dated November 1, 2020, showing an individual walking from Craft's garage to the Pinedas' front yard and placing something in the fountain area. Connie and Michella believed Craft was the individual captured in both pieces of footage.

On November 2, 2020, Michella found, in the mail, an envelope addressed to "MICHELLE PINEDA," which contained a funeral advertisement and a letter with the message, "GO N---ERS." Notably, Michella testified that Craft had incorrectly called her "Michelle" in past interactions. Craft's cellphone also had a contact entry that was labeled "Michelle Pineda." Michella continued to sift through her mail, where she located a second envelope, also addressed to "Michelle Pineda," inside of which was another envelope with both the address and return address scratched out. On that inner envelope was the message "n---ers LeAVE We hatE Your kind Last Chance" in cutout magazine letters (Count One). FBI forensic examiner Hector Maldonado later examined the inner envelope and determined that it was a piece of mail that the Girl Scouts of America previously addressed and sent to S.W. at Craft's residence. The letter left Michella panicked and terrified for her children.

On November 5, 2020, the Pinedas received another envelope, which was once again addressed to "MICHELLE PINEDA" and had as its return address the words "N---LET DESTROYER." Inside the envelope was a note with cutout letters that read, "MOVE OUT OR BULLETS!" (Count Two). The next day, the Pinedas received two more envelopes in the mail, both of which were addressed to "MICHELLE PINEDA" with the return address "N---LET DESTROYER." The first envelope contained a piece of cardboard from a Barilla box with

cutout letters that read, "tWO DEaD n---LeTS" (Count Three).[3] The second envelope contained a portion of another envelope with cutout letters that read, "YOU will DiE BITCh!" (Count Four). FBI forensic examiner Icel Kuznetsova examined the inner envelope and found two fingerprints belonging to Craft.

Around the same time, the Pinedas received another envelope in the mail, addressed to "MICHELLE PINEDA," which contained a Fifth Third Bank envelope, inside of which was (1) another piece of a Barilla pasta box with the message "Get out" in cutout letters and (2) two live rounds of ammunition wrapped in a purple latex glove. On November 11, 2020, the Pinedas posted photos of the bullets on social media. Craft saw these posts and texted Richard Watts, her ex-boyfriend and the father of S.W. Craft told Watts that the Pinedas were accusing her of sending the letter and showed him the images of the bullets. Watts immediately recognized the bullets and told Craft that they belonged to him. According to Watts, he had owned three bullets as part of a collection of old military items, which he had kept in the basement of Craft's residence while he was living there with her. Watts testified that he recognized the two bullets because they had watermarks, which resulted from a prior flood in the basement, and he further testified that he had not seen the bullets since he had moved out of Craft's home. After texting with Craft, Watts checked his old military box and saw that two of the three bullets were indeed missing; he provided the one remaining bullet to the FBI.

On November 30, 2020, Craft reported to the Louisville Police that her mail, including a Fifth Third Bank statement and a letter from the Girl Scouts, was stolen. In her testimony, Craft denied that these mailings were the ones that were sent to the Pinedas. Craft also told her mother

---

[3] This piece of cardboard came from the same Barilla pasta box as the piece of cardboard containing the message "DIE B---H" that Connie and Michella found in their front yard.

that she believed the items used for the threatening mailings—i.e., the Barilla pasta box and the Girl Scout letter—were taken from her trash by someone else.

In December 2020, the Pinedas found yet another envelope in the mail, addressed to "MICHELLE PINEDA" with a return address that again included the words "N---LET DESTROYER," along with the address for the residence of another neighbor, Matthew Lanham. Lanham testified that he never sent the letter and never allowed Craft to use his address for any purpose. Inside the envelope was another envelope containing cutout letters that spelled, "Die DiE Stupid N---ERs Die" (Count Five). This was the final threatening letter that the Pinedas received.

On July 28, 2022, counsel for the U.S. Attorney's Office for the Western District of Kentucky informed Craft that she was the target of a federal criminal investigation for mailing threatening communications and interfering with the right to fair housing. That same day, S.W. called Watts from Craft's cellphone and left him a voicemail in which she discussed the bullets and noted that she was making the call on behalf of her mother. Watts was perturbed by the voicemail and believed that Craft "forced" S.W. to call him. Craft later confirmed that she told S.W. to call Watts. Then, in October 2022, after testifying before a grand jury, Watts spoke with Craft over the phone. Watts told Craft that he had spoken with officials from the FBI and told them that the two bullets were his. According to Watts, Craft became upset and accused him of changing his story.

An investigation of Craft's cellphone revealed that she was keeping photos of the members of the Pineda family. According to Craft, she took and kept the photos to prove that the Pineda children were not Black. Craft also conducted background checks on Michella's father. Craft testified that she had these checks performed because she believed Michella's father had passed away and the Pinedas were stealing his Social Security checks.

### B.     Procedural History

On August 17, 2022, Craft was indicted on five counts of mailing communications with threat to kidnap or injure, in violation of 18 U.S.C. § 876(c).  At trial, the Government sought to introduce, over defense counsel's objection, evidence of the incidents in May 2019 and March 2020 in which S.W. directed racial slurs at the Pineda children.  The district court permitted the Government to introduce this evidence, finding that it was admissible as *res gestae* background evidence.  To prevent the jury from attributing S.W.'s slurs to Craft, the district court provided a limiting instruction.  The district court also permitted, over defense counsel's objection, FBI Task Officer Kirsten Downs to testify regarding the impact of the threats on the Pineda family, including her assessment that the threats posed a "risk" to the Pinedas.  The jury convicted Craft of all five counts.

On July 26, 2023, the district court sentenced Craft to 108 months in prison.  In determining Craft's sentence, the district court applied multiple enhancements, including (1) a six-level enhancement under USSG § 2A6.1(b)(1), finding that Craft's conduct evidenced an intent to carry out her threats; and (2) a two-level enhancement under USSG § 3C1.1 based on evidence that Craft attempted to obstruct justice by influencing Watts's testimony.  Defense counsel objected to both enhancements.  This timely appeal followed.

## II.   ANALYSIS

### A. Sufficiency of the Evidence (Count One)

Craft first challenges the jury's verdict as to Count One, arguing that the evidence was insufficient to prove this count because the message in the mailing, "n---ers LeAVE We hatE Your kind Last Chance," did not constitute a "true threat" under § 876(c).  *See* Appellant Br. 14-18.  A challenge to the sufficiency of the evidence in a criminal case is reviewed de novo.  *United States*

*v. Woods*, 14 F.4th 544, 551 (6th Cir. 2021). The court must "review the evidence in the light most favorable to the government," and it "will affirm a defendant's conviction 'if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020) (emphasis in original)). "We can neither independently weigh the evidence, nor make our own assessment of the credibility of the witnesses who testified at trial." *United States v. Garcia*, 758 F.3d 714, 718 (6th Cir. 2014).

To establish a violation of § 876(c), the Government must prove that the defendant "knowingly" mailed, via the U.S. Postal Service, a "communication . . . addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another." 18 U.S.C. § 876(c); *accord United States v. Horton*, 580 F. App'x 380, 383 (6th Cir. 2014) (same). The communication must constitute a "true threat," i.e., a "statement[] where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "The relevant question is whether a reasonable observer would take [the defendant's] words to be an authentic threat," *United States v. Doggart*, 906 F.3d 506, 511 (6th Cir. 2018), even if the communication "may be capable of more than one meaning," *United States v. Censke*, 449 F. App'x 456, 466 (6th Cir. 2011). In addition, the defendant must "subjectively intend h[er] communication to be threatening." *Doggart*, 906 F.3d at 512; *accord Counterman v. Colorado*, 600 U.S. 66, 69 (2023) (establishing a subjective-intent requirement of recklessness or above for "true threat" prosecutions). "Whether a writing is a threat is a question of fact for the jury." *United States v. Williams*, 641 F.3d 758, 768 (6th Cir. 2011). When making this determination, the jury must consider not only "the words themselves," but also "the context in which [the defendant] uttered [or transmitted] them." *Doggart*, 906 F.3d at 511.

Craft argues that the threatening communication that forms the basis of Count One— "n---ers LeAVE We hatE Your kind Last Chance"—is not a true threat because it does not express an intention to injure another person. The communication, however, must be read in context. *Censke*, 449 F. App'x at 467. At trial, the Government presented evidence that, prior to mailing this communication, Craft directed a series of violent statements at the Pineda family, including (1) threatening to run over S.P.2 with her car, (2) singing a jingle about "n---lets hanging in a tree,"[4] and (3) placing letters in the Pinedas' yard that said "DIE STUPID B---H MOVE OUT" and "DIE B---H."[5]

Given this evidence, it was reasonable for the Pinedas to interpret the words "n---ers LeAVE We hatE Your kind Last Chance" as threatening. The use of the phrase "Last Chance," coupled with the demand to "LeAVE," suggests that, if the recipient does not comply and leave the neighborhood forthwith, a previously asserted consequence will occur. In this case, that previously asserted consequence was death. When read in the context of Craft's prior threats of physical harm, a "reasonable observer" easily could have perceived the message as "an objectively serious expression of an intent to inflict" bodily injury, *Doggart*, 906 F.3d at 510, even if its words were susceptible to "more than one meaning," *Censke*, 449 F. App'x at 466. In turn, a rational jury could find, based on the evidence of Craft's prior conduct, that Craft "subjectively intend[ed]" her communication to be threatening. *Doggart*, 906 F.3d at 512.

In her reply brief, Craft contends that evidence of her prior conduct should not be considered because it exceeds the temporal boundaries set forth in the district court's jury

---

[4] Probst testified that she never heard Craft sing this racist jingle in her presence. It is not our province, however, to assess "the credibility of the witnesses who testified at trial." *Garcia*, 758 F.3d at 718.

[5] It is not entirely clear, from the available record, when the Pinedas found and read the letters that were placed in their yard. But the Government presented evidence indicating that the letters were placed in the Pinedas' yard on October 18, 2020, and November 1, 2020, before the Pinedas began receiving threatening communications in the mail.

instructions, which provided that the crime charged in Count One "occurred on or about November 2, 2020." Reply Br. 3-4 (quoting R. 50, Jury Instructions, PageID 210). But this argument conflates charged conduct with context. Craft was not charged for her pre-November 2, 2020, conduct; that conduct simply provides important context that explains why the Pinedas reasonably interpreted the message "n---ers LeAVE We hatE Your kind Last Chance" as threatening. Ignoring evidence of Craft's prior conduct would contravene the principle that "[a] statement's context must be considered in determining whether it is a true threat." *United States v. Hankins*, 195 F. App'x 295, 301 (6th Cir. 2006) (per curiam) (citing *Watts v. United States*, 394 U.S. 705, 706-08 (1969)). The "objective standard of whether a reasonable person would foresee that the statement would be interpreted as a threat" cannot be "determined in a vacuum"—Craft's earlier conduct is "critical information for the jury to weigh in deciding whether the later threat constitutes a 'true threat.'" *Censke*, 449 F. App'x at 467.

Because a rational juror could have found that the message constituted a "true threat," we affirm Craft's conviction on Count One.

## B. Evidentiary Decisions

### 1. Admissibility of Racial Slurs by S.W.

Craft next argues that the district court erred in permitting the Government to introduce, as *res gestae* evidence, two instances in which her daughter, S.W., directed racial slurs at the Pineda children. According to Craft, this evidence implies that she "imparted racial bias on her daughter," which is "the sort of propensity or character evidence barred by Rule 404(b)." Appellant's Br. 23. We review a district court's evidentiary rulings for abuse of discretion. *United States v. Kettles*, 970 F.3d 637, 642 (6th Cir. 2020).

As an initial matter, it is questionable whether the evidence of these two incidents technically qualifies as Rule 404(b) evidence. Rule 404(b) prohibits the admission of evidence of an individual's prior bad acts "to prove [the] person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). S.W.'s potential racism was not at issue, nor was the Government trying to use this evidence to prove that S.W. acted in a racist manner on any other occasion. Nonetheless, because of the unique circumstances in this case—namely, that S.W. is Craft's daughter and that she was approximately eleven to twelve years old at the time of these incidents—there was a possibility that the jury would assume that S.W. learned the slurs from her mother and thus infer that Craft had a propensity to engage in racist behavior. Under these circumstances, an analysis tracking the Rule 404(b) framework may well be appropriate. But we need not conclusively decide the point because Craft's claim fails even when measured against that rule.

"[R]es gestae" evidence, also known as "background evidence," may be admitted "in limited circumstances when the evidence includes conduct that is 'inextricably intertwined' with the charged offense." *United States v. Clay*, 667 F.3d 689, 697 (6th Cir. 2012) (quoting *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000)). Although this background evidence may involve evidence of prior bad acts, it "does not implicate" Rule 404(b). *United States v. Churn*, 800 F.3d 768, 779 (6th Cir. 2015); *accord United States v. Sadler*, 24 F.4th 515, 554 (6th Cir. 2022) (describing *res gestae* evidence as an "exception" to Rule 404(b)). "Proper background evidence has a causal, temporal or spatial connection with the charged offense." *Hardy*, 228 F.3d at 748. "Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id.*

At trial, the Government introduced evidence that, on March 22, 2020, S.W. repeatedly directed the racial slur "n---let" at K.P. and S.P.2 and called K.P. a "n---er." After S.W.'s purported use of the slur, K.P. confronted her, which, in turn, led Craft to bang on the Pinedas' front door and to audibly refer to K.P. as a "n---er." This incident precipitated the deterioration of the relationship between Craft and the Pinedas—which had, up until that point, remained cordial—and resulted in the escalating series of threats. Excluding evidence that S.W. directed slurs at the Pineda children would have left the jury with an incomplete "story of the charged offense," omitting important context as to the origin of the conflict between the two families. *Hardy*, 228 F.3d at 748. The district court, therefore, did not err in concluding that the March 22, 2020, incident, including S.W.'s use of racial slurs, was proper background evidence.

"Even if evidence is *res gestae*, we 'must also find that the district court did not abuse its discretion in concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice . . . .'" *Churn*, 800 F.3d at 779 (quoting *United States v. Joseph*, 270 F. App'x 399, 406 (6th Cir. 2008) (per curiam)). Craft argues that the evidence was unduly prejudicial because it allowed the jury to infer that she imparted racial bias on her daughter. But the district court instructed the jury that it could not attribute S.W.'s use of the slurs to Craft, infer that Craft taught S.W. to use the slurs, or infer that Craft instructed S.W. to use the slurs against the Pineda children. Jurors are presumed to follow the trial court's instructions. *See United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011). And here, the evidence had significant probative value, providing the jury with necessary context explaining the deterioration in the relationship between Craft and the Pinedas. Because the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice, the district court did not abuse its discretion in admitting it.

The May 2019 incident, however, is a different story. Unlike the March 2020 incident, the May 2019 incident does not provide any necessary context for Craft's threatening behavior. By all accounts, Craft was not involved in the May 2019 incident. Michella Pineda also testified that, although she told her children to "stay away" from S.W. following the incident, her family's relationship with Craft remained cordial. It was not until March 2020 that the conflict between the two families began. Because the May 2019 incident seems to have lacked any "close connection" with the charged offense, *Hardy*, 228 F.3d at 748, it may well not have been admissible as background evidence.

The Government contends, in the alternative, that evidence of the May 2019 incident would have been admissible as "other acts" evidence under Federal Rule of Evidence 404(b). Such evidence cannot be admitted as propensity evidence, but it may be admitted for "another purpose, such as proving opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, and lack of accident." Fed. R. Evid. 404(b). Here, the Government asserts that the May 2019 incident is admissible to prove the context and circumstances surrounding the origins of Craft's threats, as well as the motive and identity of Craft as the person who sent the threatening messages. But, as we have already explained, this incident does virtually nothing to complete the story of the offense. And it is not clear why an isolated, racist slur by S.W. helps prove motive and identity, given that Craft was not involved in the incident and that her relationship with the Pinedas remained cordial even after it occurred. This evidence thus may well have not been admissible under Rule 404(b) either.

But we need not conclusively decide whether the May 2019 evidence was admissible as *res gestae* evidence or under Rule 404(b). Even if the district court wrongly admitted this evidence, its decision was harmless. "An error is harmless unless one can say, with fair assurance

that the error materially affected the defendant's substantial rights—that the judgment was substantially swayed by the error." *United States v. Murphy*, 241 F.3d 447, 453 (6th Cir. 2001). The erroneous admission of "other acts" evidence is harmless if "the other record evidence of guilt is overwhelming, eliminating any fair assurance that the conviction was substantially swayed by the error." *United States v. Hardy*, 643 F.3d 143, 153 (6th Cir. 2011). At trial, the Government presented extensive evidence of Craft's guilt. Moreover, because evidence of the March 2020 incident in which S.W. used racial slurs was already admissible, the court's decision to admit evidence of the May 2019 incident was highly unlikely to raise any additional risk of prejudice. Even if the May 2019 incident had been excluded, the jury still would have heard evidence that S.W. directed racial slurs at the Pineda children. Because the conviction was not substantially swayed by the district court's error, we deny Craft's request for a new trial on this basis.

## 2. Admissibility of Officer Downs's Testimony

Craft also appeals the district court's decision not to exclude Officer Downs's testimony that Craft's threats posed a risk to the Pineda family, arguing that this testimony was unduly prejudicial and cumulative, and thus fails Rule 403's balancing test. *See* Fed. R. Evid. 403. To be sure, the probative value of Officer Downs's testimony was relatively minimal, given that the Pinedas had already extensively testified that they took the threats seriously and feared for their safety. Craft contends, in turn, that the testimony was unduly prejudicial because it improperly expressed an opinion on the Pinedas' credibility. Officer Downs, however, did not testify as to whether she found the Pinedas credible; rather, she testified that, based on her investigation, she assessed the threats as a risk to the Pineda family.

In any event, even assuming the district court abused its discretion, such error was plainly harmless. The record contains "abundant evidence" of Craft's guilt, rendering it highly unlikely

that Officer Downs's testimony "unfairly prejudiced the outcome of the trial." *United States v. Langhorn*, 473 F. App'x 436, 442-43 (6th Cir. 2012). Vacatur of Craft's conviction on this ground is therefore unwarranted. Nor is it warranted when considered in conjunction with the district court's erroneous admission of the May 2019 incident. *See United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012) (noting that "[t]he cumulative effect of errors that are harmless by themselves can" sometimes "be so prejudicial as to warrant a new trial"). Craft has not demonstrated that she is due a new trial, and we affirm her conviction.

## C. Application of Sentence Enhancements

### 1. USSG § 2A6.1(b)(1) Enhancement

Craft further argues that the district court erred in applying a six-level enhancement under USSG § 2A6.1(b)(1) based on "conduct evidencing an intent to carry out" her threatening communications. A sentence is procedurally unreasonable if, among other things, a district court improperly calculates the Guidelines range. *United States v. Davis*, 751 F.3d 769, 773 (6th Cir. 2014). We review the procedural reasonableness of a sentence under the abuse of discretion standard, "keeping in mind that factual findings will stand unless clearly erroneous and legal conclusions will stand unless our fresh review leads to a contrary conclusion." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).

The U.S. Sentencing Guidelines provide for a six-level enhancement when "the offense [of making a threat] involved any conduct evidencing an intent to carry out such threat." USSG § 2A6.1(b)(1). In determining whether the enhancement applies, courts consider "both conduct that occurred prior to the offense and conduct that occurred during the offense." *Id.* § 2A6.1(b)(1) cmt. n.1. "The pivotal inquiry when determining the appropriateness of a § 2A6.1(b)(1) enhancement is whether the defendant intended to carry out the threat, and the likelihood that [s]he

would actually do so." *United States v. Newell*, 309 F.3d 396, 400 (6th Cir. 2002). Application of the enhancement requires a "nexus [] between the defendant's conduct and the threats that form the basis of the indictment." *Id.* Importantly, the defendant must have "engage[d] in some overt conduct in addition to making the threats before a § 2A6.1(b)(1) enhancement can be sustained." *Id.* at 404. Courts may also consider "the tone of the threats, [] in conjunction with the defendant's other overt conduct . . . in determining whether the defendant intended to carry out h[er] threats." *Id.* at 403. But the district court may not rely on the threats alone in applying the enhancement. *Id.*

Here, as part of its assessment, the district court properly considered the nature and tone of the threats, finding that they "contained exceedingly vulgar, angry, threatening, explicit, and racist language indicating an intent to kill one or more . . . members of the victim family" and "conveyed a message of a person on a mission." Indeed, the record makes clear that the threats escalated significantly over time, becoming increasingly menacing and violent. Even more disturbingly, most of the mailed threats referenced the killing of children, repeatedly using the return address "N---LET DESTROYER," a racial slur for Black children.

It is against this backdrop that the district court correctly considered Craft's other conduct—most notably, her obtaining and mailing two rounds of live ammunition. The acts of obtaining and mailing ammunition, which occurred during the charged offense, represented a noticeable escalation from what had been, up until that point, a series of verbal and written threats. Craft's decision to bring ammunition into the mix provides evidence that her threatening words were not simply empty "puffery," but, rather, were indicative of a genuine intent to harm the Pinedas. *Newell*, 309 F.3d at 401 (quoting *United States v. Carter*, 111 F.3d 509, 514 (7th Cir. 1997)).

The court properly considered this conduct in concert with other evidence, including Craft's possessing photos of the Pineda children on her cellphone, a particularly concerning piece of evidence given that the mailings repeatedly threatened the murder of those children. In turn, the court correctly found that there was a clear nexus between the mailing of the bullets and the threats in the indictment: the bullets, and the threatening message to which they were attached, were mailed around the same time as the threats for which Craft was criminally charged. They also contained many of the same physical identifiers as the mailings for which Craft was charged— namely, the message was written in magazine cut-out letters and addressed to "MICHELLE PINEDA." Based on the totality of the evidence, it was reasonable for the district court to conclude that Craft's obtaining and mailing the ammunition constituted overt conduct evidencing an intent to harm the Pinedas.

Craft argues that the conduct of obtaining and mailing the bullets cannot constitute an overt act under § 2A6.1(b)(1) because there is no evidence that she possessed, had access to, or made any effort to obtain a firearm or any other weapon. But the relevant inquiry for § 2A6.1(b)(1) is not necessarily whether the defendant took an affirmative step toward accomplishing the threat— it is whether the defendant engaged in any overt conduct "*evidencing an intent*" to carry out the threat. USSG § 2A6.1(b)(1) (emphasis added). Our sister circuits have made clear that a defendant need not necessarily take the step of arming herself, or even be armed, for the enhancement to apply. For example, the Eleventh Circuit has held that the "mailing of a dead rat," in conjunction with death threats, represented an "overt act consistent with a scheme of threats and violence" evidencing an intent to harm the recipient. *United States v. Ellis*, No. 21-10091, 2022 WL 1112959, at *3 (11th Cir. Apr. 14, 2022). Whether the defendant possessed or attempted to acquire a weapon was not dispositive of the § 2A6.1(b)(1) inquiry. On that evidentiary record, as on this

evidentiary record, the mailing of an object indicating homicidal intent was sufficient to meet the overt-act requirement. *See id.* Other circuits have taken a similarly flexible approach to the overt-act requirement. *See, e.g.*, *United States v. Berndt*, 127 F.3d 251, 259-60 (2d Cir. 1997) (concluding that, while "no weapons were found in [the defendant's] possession," the defendant's traveling to the victim's home and lurking in her backyard were sufficient to warrant a § 2A6.1(b)(1) enhancement); *United States v. Gary*, 18 F.3d 1123, 1128 (4th Cir. 1994) (applying the enhancement based on evidence that the defendant stalked the victim and consumed drugs that increased his propensity to carry out his threats).

In sum, we conclude that the evidence is sufficient, as a matter of law, to sustain the district court's application of the § 2A6.1(b)(1) enhancement. Craft's overt act of obtaining and mailing live rounds of ammunition, considered in conjunction with her concerning fixation on the Pineda children and the increasingly violent tone of the threats, sufficed to warrant the enhancement.

### 2. USSG § 3C1.1 Enhancement

Finally, Craft contends that the district court improperly applied a USSG § 3C1.1 enhancement for obstruction of justice. Our cases have sent "mixed messages" on the appropriate standard of review of § 3C1.1 enhancements; some have reviewed application of the enhancement de novo, while others have hewed to the deferential clearly erroneous standard. *United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019) (collecting cases). But we need not resolve this issue here because, under either standard of review, the outcome is the same.

For a § 3C1.1 enhancement to apply, the district court must find by a preponderance of the evidence that (1) "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and (2) "the obstructive conduct related to" either "the

defendant's offense of conviction and any relevant conduct" or "a closely related offense." USSG § 3C1.1.

The district court determined that the enhancement was warranted based on evidence that Craft attempted to influence Watts's testimony regarding the instant offense. Specifically, the court cited (1) the October 2022 conversation in which Craft accused Watts of "chang[ing] [his] story" and (2) S.W.'s call to Watts, at Craft's direction, to discuss the bullets. Craft argues that this evidence cannot "reasonably be construed as an attempt by Ms. Craft to threaten or intimidate [Watts] or influence his testimony." Appellant Br. 34-35.

As we have repeatedly held, "a defendant's attempt to affect the testimony or evidence against h[er] is an obstruction of justice." *United States v. Pearson*, 40 F. App'x 887, 891 (6th Cir. 2002) (per curiam) (collecting cases). A court "may draw all reasonable inferences from the defendant's words and conduct, as well as other relevant circumstances," and "even subtle attempts to persuade a witness or co-defendant to testify falsely justify this enhancement." *United States v. Sosa-Baladron*, 800 F. App'x 313, 329 (6th Cir. 2020). Here, the district court's application of the enhancement survives even de novo review. Craft's decision to speak with Watts after his grand jury testimony and accuse him of "chang[ing] [his] story" can reasonably be interpreted as an effort by Craft to encourage Watts to alter his testimony. Indeed, Watts testified that he thought Craft was "lying" and attempting to "set [him] up." The circumstances of S.W.'s call to Watts similarly indicate an attempt by Craft to influence Watts's testimony. Craft conceded that S.W. called Watts at her direction—on the same day that she received a target letter from the Department of Justice—to discuss the location of the bullets, and Watts testified that he was unsettled by the voicemail and thought that S.W.'s statements about the bullets did not make sense. The court

properly relied on Watts's testimony, in conjunction with Craft's concession, in determining that an attempt at obstruction occurred.

The district court properly concluded by a preponderance of the evidence that Craft willfully engaged in obstructive conduct. We therefore affirm the district court's application of the two-level enhancement under § 3C1.1.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.